AMB:AZB
AO 91 (Rev. 11/11) Criminal Complaint                                                                                         2015R00429

# UNITED STATES DISTRICT COURT
for the
District of Minnesota

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SENG XIONG | Case No. 16-MJ-233 JJK |

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about April 19, 2015, in the State and District of Minnesota and elsewhere, defendant Seng Xiong,

- aiding and abetting, and being aided and abetted by others, having devised a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises, transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, sounds, and other signals for the purpose of executing such scheme.

All in violation of Title 18, United States Code, Section 1343 (wire fraud).

I further state that I am a Task Force Officer with the United States Secret Service and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:   ☒Yes   ☐ No

*Complainant's signature*

Daniel Mack, Task Force Officer, U.S. Secret Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/28/16

City and State: St. Paul, MN

*Judge's Signature*

Jeffrey J. Keyes, U.S. Magistrate Judge
*Printed Name and Title*

SCANNED
MAR 2 3 2016
U.S. DISTRICT COURT ST. PAUL

1

STATE OF MINNESOTA
COUNTY OF RAMSEY                    ss.        AFFIDAVIT OF DANIEL MACK

## INTRODUCTION AND AGENT BACKGROUND

1. The following affidavit is made in support of a criminal complaint and arrest warrant for Seng Xiong ("XIONG") for violation of 18 U.S.C. Section 1343 (Wire Fraud).

2. I am an officer with the St. Paul Police Department (SPPD) and currently assigned as a Task Force Officer with the United States Secret Service (USSS) to the Minnesota Financial Crimes Task Force (MNFCTF). I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I have been a law enforcement officer for 12 years. As a Task Force Officer and a member of the MNFCTF, my duties and responsibilities include conducting criminal investigations of individuals and businesses for possible violations of federal laws, particularly those laws found in Title 18 of the United States Code, including mail fraud, bank fraud, wire fraud, identity theft, access device fraud, interstate transportation of stolen goods, money laundering, and structuring. As a criminal investigator involved in financial crime investigations, I have received training and attended conferences on organized crime including money laundering and asset forfeiture.

3. During my career as a police officer, I have participated in and conducted numerous complex criminal investigations of individuals involved in illegal

1

activities for possible violations of the United States Code and related offenses as previously described. These investigations have involved surveillance, interviewing witnesses and targets, executing search warrants and arrest warrants, and securing seized evidence, including United States currency, stolen identification documents and other means of identification, bank documents, electronic communications including cell phone data and e-mails, and analyzing large volumes of information and data.

4. The statements in this affidavit are based on first-hand knowledge that I have gained through investigating this matter as well as information that has been provided to me by cooperating witnesses and other law enforcement officers who are participating in the investigation. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### *The Promise of a Hmong Homeland*

5. On September 14, 2015, the Appleton Police Department in Appleton, Wisconsin, received an anonymous tip about two people in the Hmong community who were believed to be defrauding elderly Hmong people. The tipster stated that elders were being told to deposit $3,000 to $5,000 into Wells Fargo checking account number XXXXXX4810, held in the name of "Seng Xiong" (hereinafter "XIONG's Wells Fargo checking account"). In exchange for this payment, elders

were promised 10 acres of land, a house, and many other benefits in a future country that would be established as a Hmong homeland.

6. On September 28, 2015, law enforcement in St. Paul, Minnesota, received a call from a confidential source stating that a "Seng Xiong" has been conducting suspicious activity through his organizations "International Fund for Hmong Development" and "Hmong Tebchaws," and was believed to be conducting a fraud scheme.

7. After receiving the September 28 tip, law enforcement reviewed a website for "Hmong Tebchaws" at www.hmongtebchaws.net. The website listed the organization's contact phone number to be 712-432-5232, and its address as XXXX E. Kings Canyon, #XXX, Fresno, CA 93727. The website listed the "mission" of the organization as "Pursue Hmong self-ruled (sic) in the mainland of Asia in accordance with international law." The website contained links to YouTube videos where more information about the "investment program" was provided. Bluehost, the company that maintains the webpage for www.hmongtebchaws.net, informed law enforcement that the person who opened the account is Seng Xiong, who provided the address of XXXX E. Kings Canyon Road, Fresno, CA, phone number 559-779-9513, and email address of sengienxng@yahoo.com.

8. On October 6, 2015, investigators spoke to a cooperating witness with the initials K.X., who lives in North Carolina and stated he had been following the "Hmong Tebchaws" website. According to K.X., the organization began posting

3

information on its website, as well as various social media sites, in approximately October 2014 and had been hosting conference calls for potential "investors" since that time. K.X. had participated in six (6) of these conference calls between April 4 and September 21, 2015, and made recordings of those calls. K.X. provided his recordings to investigators.

9. Based on the information K.X. gathered through these conference calls and by monitoring the website and social media, the organization was targeting the elderly Hmong to make contributions toward a future Hmong country that would be created sometime between 2015 and 2030. According to K.X., "investors" were instructed to view a YouTube video which showed an individual with the initials "S.M." talking about the history of the Hmong and how their land was taken from them by years of war with China. Among other things, S.M. claimed that once there is a Hmong country, no one will be able to take it away, and that the people of the Hmong country will prosper and not suffer. After watching the video, viewers were directed to call 712-432-5232 to receive more information. During the call, victims were given different investment options which purported to represent varying levels of return that those who became "founders" would receive on their investments. The "founder" option was described as: a $3,000 investment would provide 5% of 25% of the "founder's tax"; a $4,000 investment would provide 8% of the 25%; and a $5,000 investment would provide 12% of the 25%. (What these percentages mean, specifically, is unclear). All investments purportedly guaranteed the "investor," and his or her future generations: 10 acres

of land, a five bedroom house, free healthcare, free education, and government financial assistance for persons over 65 years of age. "Investors" were also told that the program was capped at 3,000 people, and the initial "investors" had to buy in by September 20, 2015. There was also another "investment" option which was $20 per month, or $240 per year. This option would give an "investor" citizenship in this new Hmong country as well as the free education and health care laid out in the "founder" option.

10. K.X. explained that in the YouTube video and conference calls, XIONG and S.M. claimed they were undertaking this effort to create a country in Southeast Asia with the full support of the United Nations and the White House.

11. According to K.X., when investors were ready to send their money, they were directed to contact S.M. directly at 559-213-5007. K.X. followed this path and contacted S.M. by telephone. S.M. provided XIONG's name and Wells Fargo checking account number XXXXXX4810 (the same account number that was provided to the Appleton, Wisconsin tipster), and directed K.X. to pay the money to XIONG by depositing the money into XIONG's account. K.X. followed the instructions and made a deposit just prior to the September 20, 2015 "deadline." Once the deposit was made, "investors" were instructed to hold on to their deposit slip as proof of their investment.

12. A cooperating witness with the initials "M.V.," who lives in Minneapolis, Minnesota, told investigators that he listened to many of the Hmong Tebchaws conference calls and learned that XIONG was the leader of the organization and

S.M. was its spokesperson. M.V. was assured that people in the organization were working with the White House and United Nations and all the proper procedures were being followed in order to create a new country for Hmong people. During the conference calls, S.M. directed M.V. and other listeners to the Hmong Tebchaws website and YouTube videos to find proof of the movement's authenticity. M.V. stated he was informed that in exchange for a $3,000 investment, which was the highest amount he could afford, he would receive two to three acres of land, a home, free health care, and financial assistance which he described would function similar to Social Security in the United States. M.V. stated that when he agreed to invest, he was given S.M.'s telephone number. He called S.M., who gave him instructions over the telephone on how to deposit the money; specifically, to deposit it into XIONG's Wells Fargo checking account, and that it should not be in the form of a personal check or credit card. M.V. made his $3,000 payment in the form of a cashier's check from TCF Bank dated April 19, 2015, made payable to XIONG.

13. Shortly after depositing his payment into XIONG's Wells Fargo checking account, M.V. received a letter that was in the form of a receipt. The letter listed "Seng Xiong" and the Wells Fargo checking account number, along with the telephone number 559-779-9513, and the e-mail address of sheeyeng07@hotmail.com as ways to presumably communicate with XIONG or the Hmong Tebchaw organization. The document was titled, "Hmong Tebchaws" and stated, "Special

25% Enrollment Form" across the top. It listed M.V.'s "enrollment date" as April 20, 2015, and was acknowledged with XIONG's signature dated June 11, 2015.

14. Investigators conducted an internet (Google) search for sheeyeng07@hotmail.com and were directed to a website www.hmongtebchaw.us. The website contains a link for information on donating, and refers donors to the sheeyeng07@hotmail.com e-mail account for further information about the Hmong Tebchaws organization. Through the course of this investigation, your affiant knows www.hmongtebchaw.us to be a website associated with XIONG and S.M. though it is different than the www.Hmongtwbchaws.net website described at paragraph 7, above. Both websites direct potential "donors" to call 712-432-5232 to learn more about the Hmong Tebchaws organization. The www.hmongtebchaw.us website also contains a section, "About Us," that mentions S.M. at phone number 559-213-5007 (the same phone number for S.M. that was provided to investigators by the Appleton, Wisconsin tipster and by K.X. as referenced above), and identifies S.M. as "Director of Communications" for the organization.

*XIONG Reports Making Progress on Securing a Country for the Hmong*

15. As set forth above, XIONG, S.M., and others used conference calls, YouTube videos, and the Hmongtebchaws websites to recruit individuals to invest in the new Hmong homeland and/or to "donate" money in support of XIONG's efforts to secure the new country. Those who decided to invest were directed to call S.M.

7

for instructions; they were ultimately instructed to deposit money into XIONG's Wells Fargo checking account.

16. In a YouTube video posted on or about September 11, 2015, XIONG states that the Hmong land and country have already been secured, and that they are just waiting for the word to move. In another video posted around the same time period, XIONG tells his audience that the time is nearing and they are going to be leaving for the new country soon. In yet another video, XIONG claims that the time has come, they have a name and they have a country. It is all completed, and they are just waiting for the right time.

17. In a YouTube video posted on or about September 16, 2015, XIONG states that Washington DC has "approved" or "activated" the Hmong country, that Washington DC had already surveyed a piece of land for the Hmong territory. Xiong claimed that he would not say how big the land is or where it is located, just that he was informed it is somewhere in Southeast Asia and he cannot talk too much about it. XIONG goes on to tell the audience that the door to regular membership has closed "today" but they are still accepting people for the Founder Membership program until they get the new country. He directs audience members to use the form on their website to request information about the Founder Program.

18. In one YouTube video posted on or about September 26, 2015, XIONG claims that countries like China, Japan, Laos, Cambodia, and Vietnam have agreed to acknowledge the Hmong people and have saved a piece of land for the Hmong

people. XIONG claims that he cannot say publicly where that piece of land is located, but that all the Hmong people need to know is that the land has been activated for occupancy. XIONG states that Hmong people should prepare themselves for the new world, but that he cannot reveal too much until the discussions are finalized at the Security Council in New York. XIONG invites the audience to visit their website, www.Hmongtebchaws.net, for further updates. He instructs the listeners that they must not wait too long, because when they see the word "fly" then that means those who have signed up for the new country have already gone. He advises the audience to not send money to Fresno anymore, that the organization is shutting down because the time is nearing. He bids the listeners farewell.

***Law Enforcement's Seizure of Funds and Communications with XIONG***

19. Records from Wells Fargo Bank indicate that Seng Xiong opened Wells Fargo checking account XXXXXX4810 (XIONG's Wells Fargo checking account) on July 15, 2013, from a location in New Brighton, Minnesota, utilizing a state issued Minnesota identification card as proof of his identity. Your Affiant and other law enforcement agents working on this investigation have reviewed records of this account received from Wells Fargo Bank.

20. As noted above, prospective "investors" were directed to deposit cash into XIONG's Wells Fargo checking account. Different buy-in levels of $3,000, $4,000 or $5,000 were available to investors.

21. Between September 2, 2014, and September 22, 2015, cash deposits totaling

9

$1,150,838.60 were made to XIONG's Wells Fargo checking account. Another $77,725.00 in deposits were made from wire transfers, and $129,921.05 was deposited in the form of checks (personal checks, cashier's checks, business checks, and money orders), for a total of $1,358,484.65.

22. The cash and check deposits were made at Wells Fargo Bank locations in several states, including but not limited to Minnesota, California, and Wisconsin. Deposits were typically in an amount at or below $5,000. Numerous deposits were made in the amounts of $3,000, $4,000 or $5,000. Where the deposit was made by check, in many instances the purpose of the check was noted in the "memo" line of the check. For example:

   a. On September 14, 2015, a deposit was made to XIONG's Wells Fargo checking account which consisted of a check drawn on a personal checking account of Z.P.V. and M.X. The check was in the amount of $3,000 and the memo line listed "Hmong Community";

   b. On September 18, 2015, a deposit was made to XIONG's Wells Fargo checking account which consisted of a check drawn on a personal checking account of M.H.L. The check was in the amount of $5,000 and the memo line listed "Hmong Tebchaws."

23. As noted above, more than $77,000 was deposited into XIONG's Wells Fargo checking account through wire transfers. For example, on the monthly statement covering the time period from May 7, 2015, to June 4, 2015, there were six wire transfers into the account, all coming from different senders, in the amounts of $185.00, $250.00, $3,000, $3,000, $600.00, and $560.00. The total amount of deposits that month, from all sources, was $192,537.00.

24. Between September, 2014 and October, 2015 XIONG's Wells Fargo checking

account records show the following expenditures: Lodging (hotels and hostels) $35,764.06; travel expenses (flights, taxis, busses, trains) $21,602.07; living expenses (meals, drugstores, restaurants and grocery stores, clothing) $8,774.02; and the largest expenditure, by far, of $48,446 in ATM withdrawals. There were what appear to be business related expenses (e.g. copying) totaling just $1,123.26; however there were no expenditures for land, office space, lobbying, or other significant business related expenses.

25. On October 19, 2015, this Court authorized a seizure warrant for the funds in XIONG's Wells Fargo checking account. Investigators executed that warrant on October 20, 2015, and seized $1,186,829.56 from the account.

26. On November 20, 2015, Your Affiant and other law enforcement officers executed a search warrant on a Holiday Inn hotel room in St. Paul, Minnesota, where XIONG was staying. During execution of the warrant, XIONG confirmed that the Wells Fargo checking account that law enforcement had seized belonged to him. He claimed that he is a "human rights advocate," that he was unemployed, that he does not have a permanent address but that he lives in hotels, he had collected donations to help people who were suffering, and that he had done nothing wrong.

27. Among other items seized from XIONG during execution of the search warrant on November 20, 2015, was his computer. Law enforcement located a document in XIONG's computer that identified two St. Paul Police Officers who are working on this investigation, Sergeant Jennifer O'Donnell and Officer Daniel Michener, as investigating XIONG. Further, the document contains a list entitled "Hmong

11

officers of the St. Paul Police Department," and specifically identifies one Hmong officer (and his family) who has been assisting in the investigation by interviewing victims and working on translations. This document was created on October 27, 2015.

28. In a search of XIONG's cellular telephone and computer, reviewing his email correspondence and calling records, investigators were unable to find any evidence to indicate that XIONG was in contact with anyone at the White House or in Washington D.C., New York, or anywhere else, who had approved, considered, or discussed any kind of Hmong homeland, territory, or country. In a two-week period between August 21, 2015, and September 4, 2015, XIONG made 11 phone calls to the United Nations "visitor center" number; investigators are aware that XIONG brought a group of Hmong individuals to the United Nations on September 5, 2015, for a pre-arranged informational meeting about the mission and work of the United Nations. Witnesses to that meeting claim that at no time was the subject of a country or nation or homeland for the Hmong people raised; rather it was a general presentation about the United Nations with some discussion about the United Nations' role in issues concerning Southeast Asia. Other than the calls leading up to that visit, XIONG made no other calls to the United Nations between September, 2014 and October, 2015.

29. Between January and February, 2016, XIONG attempted to contact law enforcement on several occasions to inquire about the funds seized from his Wells Fargo checking account. XIONG indicated he had retained an attorney. Law

enforcement instructed him that he must make contact through his attorney, and not directly.

30. Your Affiant is aware that the Assistant United States Attorney working on this matter made multiple attempts to reach XIONG's attorney, to no avail. On March 4, 2016, agents hand-delivered a letter from the AUSA to XIONG's attorney and an associate of his attorney. The letter notified XIONG's attorney that prompt attention to this criminal investigation was necessary, that it was in XIONG's best interest to be represented by criminal defense counsel at this time, and that law enforcement was interested in meeting with XIONG and his attorney to discuss the matter. On March 10, 2016, XIONG's then-attorney responded that he is a civil lawyer. He sent an email stating that he had spoken to XIONG, and that XIONG indicated XIONG would respond by March 17, 2016, as to whether XIONG had retained private defense counsel or whether XIONG wanted assistance in securing the aid of a federal public defender. To date, XIONG has not responded, and XIONG's then-counsel has confirmed that he no longer represents XIONG.

31. On March 18, 2016, XIONG purchased a ticket to Thailand departing on March 24, 2016, at 12:00 noon from LAX airport and returning to the United States on December 31, 2016.

## CONCLUSION

32. Based on the foregoing, Your Affiant believes there is probable cause that XIONG, aiding and abetting and being aided and abetted by others, has used (or caused the use of) wire communications such as telephone, internet, email and

13

wire transfers of funds, in furtherance of a scheme to defraud, in violation of Title 18, United States Code, Section 1343.

Further your Affiant sayeth not.

_____
Daniel Mack, Task Force Officer
United States Secret Service

SUBSCRIBED and SWORN to before me
this 23 day of 2016.

_____
The Honorable Jeffrey J. Keyes