# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>           Plaintiff,<br><br>v.<br><br>Seng Xiong,<br><br>           Defendant. | Case No. 16-cr-167 (SRN/HB)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Amber M. Brennan, Craig R. Baune, James S. Alexander, and Surya Saxena, United States Attorney's Office, 300 South 4th Street, Suite 600, Minneapolis, MN 55415, for Plaintiff.

Kyle David White and Thomas Anthony Hagler, Office of Kyle White, 332 Minnesota Street, Suite W-1610, Saint Paul, MN 55101; and Travis M. Keil, Keil Defense, PO Box 44295, Eden Prairie, MN 55344, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Before the Court is Defendant Seng Xiong's Motion to Vacate, Set Aside, or Correct Sentence [Doc. No. 176] pursuant to 28 U.S.C. § 2255 (2012). In his Motion, Xiong claims he received ineffective assistance of counsel[1] before and during his trial for wire fraud and mail fraud. (Xiong Mot. to Vacate, Set Aside, or Correct Sentence ("Xiong § 2255 Mot.") [Doc. No. 176].) For the following reasons, the Court **DENIES** Xiong's Motion to Vacate,

---

[1] By asserting ineffective assistance of counsel, Xiong waived the attorney-client privilege between himself and his trial counsel, Nom Fue Thao, Esq., as to the matters asserted in his motion. (*See* Waiver Order [Doc. No. 183] at 1.)

Set Aside, or Correct Sentence, **DENIES** his request for an evidentiary hearing, and **DENIES** his request for a certificate of appealability.

## I.     BACKGROUND

The facts of this case are well known to the Court and have been summarized in the Eighth Circuit's decision on Defendant Seng Xiong's appeal. *See United States v. Xiong*, 914 F.3d 1154 (8th Cir. 2019).

### A.     Factual Background and Trial

During the Vietnam War, many Hmong individuals provided assistance to the United States. *Id.* at 1157. When the United States withdrew from the region, the Hmong faced persecution by the Laotian government, which caused many Hmong to flee to nearby countries, as well as the United States. *Id.* Xiong, a Hmong man born in Laos, came to the United States at a young age. *Id.* In the early 2000s, Xiong participated in various Hmong advocacy organizations. *Id.*

#### 1.     The Hmong Tebchaws

From mid-2014 to early 2016, Xiong represented to the Hmong community that he was working with the United Nations and the United States government to establish a new country for the Hmong people in Southeast Asia. *Id.* He did so by creating a group named the "Hmong Tebchaws," which translates to "Hmong Country." *Id.* This project received enthusiastic support from many members of the Hmong community. *Id.*

Xiong promoted the Tebchaws and solicited "donations" through a conference call line, a YouTube channel, a radio broadcast, a website, and a personal cell phone number. *Id.* The conference call line had been set up by another Hmong individual, Steve Moua, who

2

previously used the call line for unrelated business ventures. *Id.* Moua also permitted Xiong to use his YouTube channel to upload Xiong's visual presentations. If someone wanted to contribute to Xiong's group, they could do so by depositing funds directly into Xiong's bank account; the account information was available on the Hmong Tebchaws website. *Id.*

Xiong represented to the Hmong community that various levels or tiers of monetary support would entitle donors to proportional rewards from the soon-to-be established new Hmong country and government. *Id.* Specifically, he represented that the best benefits would accrue to those who paid between three and five thousand dollars, as they would receive a share of the government's surplus each year. *Id.* He also stated that space was limited in each donor class, and that Hmong families and individuals needed to obtain membership to join the migration to the new nation. *Id.* Xiong refused to disclose the identities of those individuals at the United Nations or in the United States government with whom he was working, frequently asserting that his operations were "top secret." *Id.* On September 16, 2015, Xiong released a final video on Moua's YouTube channel claiming that authorities had approved the new Hmong country, and that the Hmong people would be able to travel to the new country in the next few days. *Id.* at 1158.

### 2. Xiong's Arrest and Indictment

Shortly after Xiong's "final" video was uploaded, and following several tips that Xiong was committing fraud, law enforcement began investigating Xiong's Hmong Tebchaw organization. *Id.* In March of 2016, Xiong was arrested while boarding a flight to Thailand. *Id.* He was eventually indicted for wire fraud and mail fraud. (*See* Superseding Indictment [Doc. No. 63].) By the time he was arrested, Xiong had received about $1.7 million from

Hmong individuals, $169,000 of which he spent on personal expenditures such as food, clothing, air travel, hotels, and escorts. *Id.*

### 3.  Assertion of Defense Based on Perceived Public Authority

Prior to trial, and at the government's request, the Court ordered Xiong to disclose whether he intended to raise a defense based on perceived public authority, and what government officials or evidence he would rely on. *Xiong*, 914 F.3d at 1158; *see also* Fed. R. Crim. P. 12.3(a) (setting forth rules governing the use of a public authority defense). Xiong failed to make the required disclosures, so the government moved in limine to exclude any evidence related to any perceived public authority defense unless he proffered the evidence by the time of the pretrial conference. (*See* Gov't Mot. In Limine [Doc. No. 71].) However, even after the Court extended the deadline for the disclosures, Xiong failed to comply, so the Court granted the government's motion and instructed Xiong that if he intended to present any affirmative testimony or evidence at trial claiming that he acted pursuant to public authority, he would have to provide the Court and the government with a detailed list of expected witnesses and evidence relevant to the defense by the time of the pretrial conference. (*See* Order granting Gov't Mot. In Limine [Doc. No. 76].)

After the deadline passed, Xiong filed a disclosure listing five government officials to whom he would refer, but not call to testify, while presenting his case. (*See* Xiong Disclosure [Doc. No. 79].) The government again moved in limine to preclude Xiong's counsel from suggesting in his opening statement or before Xiong's case-in-chief that Xiong had met with government officials. (*See* Gov't Reply to Xiong's Disclosure [Doc. No. 82].) To clear up the issue, the Court scheduled a pretrial hearing and ordered Xiong to clarify whether he

planned to assert a defense based on perceived public authority, and if he did, to proffer evidence sufficient to make a prima facie showing as to each element of his chosen theories. (*See* Order on Public Authority Defense [Doc. No. 84] at 7–8.)  The Court also set forth three defenses Xiong might raise based on perceived government authority: public authority, entrapment by estoppel, and innocent intent.  (*Id.* at 4–6.)

At the pretrial hearing, Xiong's counsel stated that although Xiong did not "have any public authority or any experts who [would] testify[] on behalf of the Defendant," he noted that Xiong had "advised" him that "he will be making references in regards to conversation that he has [had] with public authorities in the past that may have inferred or gave him the – a belief that what he's doing is actually within the legal – the laws of the United States and international laws (sic)."  (*See* TT Vol. 1 [Doc. No. 155] at 4.)[2]  When asked whether he would be asserting a public authority defense or not, Xiong's counsel stated: "I would not be asserting a public authority defense but however the language or the testimony from Mr. Xiong may cross the line, Your Honor."  (*Id.* at 6.)  Xiong's counsel was unable to proffer evidence of these communications because Xiong had not shared them with his counsel— allegedly because the communications were "confidential," (*id.* at 5)—so the Court engaged in a colloquy directly with the defendant.  (*Id.* at 8.)  At that time, unexpectedly, Xiong admitted that no government authority ever approved a Hmong nation; at best, government officials informed him of various criteria he would have to meet to qualify.  (*Id.* at 11–12.)

---

[2]        The Court uses "TT" for "trial transcript" to reference the record of proceedings.

The Court put Xiong under oath shortly after beginning this discussion, (*Id.* at 13–14), informed him of his right to remain silent, the burden the government faced in proving its case again him, and instructed him that nonetheless, if he chooses to pursue an affirmative defense at trial, he has an obligation (typically through counsel) to proffer the basis of that defense. (*Id.* at 15.) After Xiong acknowledged these warnings, he spoke with his counsel off the record. (*Id.* at 17.) Following their conversation, Xiong's counsel informed the court that he would be pursuing an innocent intent defense, not a public authority defense. (*Id.* at 17, 22 (confirming that Xiong would not be pursuing "any public authority defense"). The government noted that in light of this position, it agreed with Xiong's counsel that, to the extent Xiong was going to offer any evidence of conversations with government officials, such evidence would not be offered until Xiong's case-in-chief. (*Id.* at 21–22.)

Xiong's trial lasted eight days. During that time, the government presented evidence that Xiong had lied to his followers about working with authorities to create a Hmong homeland. *Xiong*, 914 F.3d at 1158–59. Several government officials testified that Xiong had never visited the White House, had never spoken with the State Department about forming a new nation, and had never notified the United Nations of the Hmong Tebchaws and their hope for a homeland. *Id.* at 1159. In fact, the evidence identified no one at the United Nations nor any government official who was aware of Xiong or his project, and had never approved the creation of a new Hmong nation. *Id.* And while Xiong had, in the past, been involved in Hmong advocacy, there was simply no evidence that he had ever coordinated with the United Nations or the United States on creating a Hmong country. *Id.* The jury returned guilty verdicts on both counts. (*See* TT Vol. 8 [Doc. No. 162] at 1361.)

For sentencing, new counsel was appointed for Xiong at his request. *Xiong*, 914 F.3d at 1159. The Court sentenced Xiong to 87 months' imprisonment on each count, to run concurrently, and imposed a 3-year term of supervised release and restitution totaling $1,226,466. *Id.*

### B.      Appeal to the Eighth Circuit

Xiong appealed to the Eighth Circuit, where he argued that the Court erred by (1) disallowing him from presenting affirmative defenses based on perceived public authority; (2) violating his Fifth Amendment rights by questioning him directly; (3) violating his Sixth Amendment rights by barring him from presenting witnesses and because his trial counsel was ineffective; and (4) imposing a sentence that was procedurally and substantively unreasonable. *Id.* at 1157. The Eighth Circuit affirmed Xiong's conviction and rejected his arguments. *Id.* at 1162.

With respect to defenses based on perceived public authority, Xiong argued that the Court abused its discretion by requiring him to show actual authority—as opposed to "apparent authority"—from a government official to raise public authority defenses. *Id.* at 1160. The Eighth Circuit disagreed, noting that even if the law only required him to show that a government official had "apparent authority"—an issue that the Eighth Circuit has not yet addressed in this context—Xiong had failed to offer any evidence showing even apparent authority that would support a public authority defense. *Id.*

With respect to his constitutional right to remain silent, the Eighth Circuit held that any questioning of Xiong by the Court did not occur in the presence of the jury, and in any event, Xiong's answers were never presented to the jury, which meant Xiong's right against

self-incrimination was never violated. *Id.* at 1161. With respect to Xiong's contentions about his right to obtain witnesses, Xiong never established that the testimony of the witnesses he sought to call—which he failed to name on appeal—would have presented favorable and material testimony, rendering unsatisfied a key prerequisite to the right to compulsory process. *Id.* The Eighth Circuit declined to address Xiong's ineffective assistance of counsel claim because it was not presented to the district court and lacked a record for appeal. *Id.*

Finally, the Eighth Circuit upheld Xiong's sentence and concluded that the Court had not abused its discretion. *Id.* at 1161. The Eighth Circuit noted that the Court had explicitly considered potential sentencing disparities among similarly situated defendants, and had adequately explained that its sentence was based on Xiong's misrepresentations and efforts to "prey" on his vulnerable followers. *Id.*

### C. The Present § 2255 Motion

On May 7, 2019, Xiong filed the present Motion to Vacate, Set Aside, or Correct Sentence. (*See* Doc. No. 176.) Xiong requests that his sentence be vacated, set aside, or corrected, or in the alternative, that an evidentiary hearing be scheduled for further consideration of his motion.

## II. DISCUSSION

### A. Applicable Legal Standard

Section 2255 "was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Sun Bear v. United States*, 644 F.3d 700, 704 (8th Cir. 2011) (citation omitted) (internal quotation marks omitted). The statute's language states:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

While § 2255's language is broad, its remedy " 'does not encompass all claimed errors in conviction and sentencing.' " *Sun Bear*, 655 F.3d at 704 (quoting *United States v. Addonizio*, 442 U.S. 178, 185 (1979)). Instead, it encompasses "jurisdictional and constitutional errors," and only extends to errors of law where the " 'claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice.' " *Id.* (quoting *Addonizio*, 442 U.S. at 185 (internal quotation marks omitted)); *see also Walking Eagle v. United States*, 742 F.3d 1079, 1081–82 (8th Cir. 2014) (noting § 2255 relief is "reserved for transgressions of constitutional rights and [] a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice" (citation omitted) (internal quotation marks omitted)). When seeking relief under § 2255, "[t]he movant bears the burden to prove each ground entitling relief." *Golinveaux v. United States*, 915 F.3d 564, 567 (8th Cir. 2019).

Xiong's claims are properly before the Court. Xiong asserts ineffective assistance of counsel claims, which are constitutionally-based claims of error properly raised in § 2255 motions. *See United States v. Nguyen*, 371 Fed App'x 701, 702 n.3 (8th Cir. 2010) (noting that ineffective assistance of counsel claims are "usually best litigated in collateral proceedings" such as § 2255 motions). The Court turns to the merits of Xiong's claim.

## B.    Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. In *Strickland v. Washington*, 466 U.S. 668, (1984), the Supreme Court solidified that this constitutional right to counsel is " 'the right to the *effective* assistance of counsel.' " 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). The Court then set forth a two-pronged test for evaluating claims of ineffective assistance of counsel. *Id.* at 687. To show ineffective assistance of counsel, a defendant must "demonstrate both that his attorney's performance 'fell below an objective standard of reasonableness' and that he was prejudiced as a result." *Meza-Lopez v. United States*, 929 F.3d 1041, 1044 (8th Cir. 2019) (quoting *Strickland*, 466 U.S. at 687–88), *cert. denied*, 2020 WL 129956, ___ S. Ct. ___ (2020)). To establish the first prong and show deficient performance, a defendant must show that " 'counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.' " *Guzman-Ortiz v. United States*, 849 F.3d 708, 713 (8th Cir. 2017) (quoting *Strickland*, 466 U.S. at 687). To establish the second prong and show prejudice, the defendant must show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). "Prejudice is not shown if the evidence is so strong that the outcome of the case could hardly have been other than a verdict of guilty." *United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001). Ineffective assistance claims are analyzed in the context of the " 'strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance[.]' " *Guzman-Ortiz*, 849 F.3d at 713 (quoting *Strickland*, 466 U.S. at 689). Additionally, a court need not determine whether an attorney's performance was deficient before examining whether the defendant suffered any prejudice if it is "easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." *Nelson v. United States*, 909 F.3d 964, 970 (8th Cir. 2018).

Xiong raises six broad bases for ineffective assistance of counsel: (1) trial counsel's purported explicit and implicit concessions of guilt several times throughout trial; (2) trial counsel's failure to raise an entrapment by estoppel defense, submit a Rule 12.3 notice, or file other pretrial motions; (3) trial counsel's failure to properly advise his client on public authority defenses; (4) trial counsel's failure to request appropriate and necessary jury instructions; (5) trial counsel's failure to competently handle witnesses at trial, call available witnesses, properly impeach government witnesses, and elicitation of damaging testimony; and (6) trial counsel's plainly deficient performance and lack of preparation. The Court addresses each point in turn.

### 1.     Purported Concessions of Guilt

Xiong first argues that his counsel was ineffective because he conceded guilt several times during the trial without first consulting him as to that strategy. (Def.'s Mem. at 4–5.) Xiong contends that his trial counsel conceded guilt (a) during his opening statement; (b) during cross examination of government witness Steve Moua; (c) by advising Xiong to invoke his Fifth Amendment protection during his testimony in front of the jury; and (d) during closing arguments. (*Id.* at 5.) Each asserted violation is addressed in turn.

### a.      Opening Statement

Xiong argues that trial counsel implicitly conceded his guilt during his opening statements, which occurred after the government rested. (*See* Def.'s Mem. at 5–6; TT Vol. 6 [Doc. No. 160] at 956.) Specifically, Xiong asserts that trial counsel conceded guilt by stating that he had the "difficult duty of defending Mr. Seng Xiong," and by stating that "Xiong did a lot of the things that you heard." (TT Vol. 6 at 956, 957.) He contends that this was "essentially . . . a plea of guilty in front of the jury, without any foreseeable benefit," and that it was "irresponsible, unreasonable, and patently ineffective assistance." (Def.'s Mem. at 6.) Xiong relies on a Second Circuit decision, *Lindstadt v. Keane*, 239 F.3d 191, 202–203 (2d Cir. 2001), in which the court found ineffective assistance of counsel where, along with several other errors, counsel told the jury during opening arguments that the defendant would testify only if the defense felt that the prosecutors had "made their case," thus transforming the defendant's exercise of his right to testify into a concession of guilt.

The government, in response, argues that trial counsel's comments came after three days of trial involving numerous witnesses and pieces of evidence showing Xiong's actions. (Gov't Mem. in Opp'n (Gov't Mem.) [Doc. No. 189] at 26.) When viewed as a whole, the government argues, trial counsel's statements referred to the amount of labor involved in the trial, the seriousness of the allegations against Xiong, and the nature of his defense. (*Id.* at 26–27.) At the very worst, the government argues that counsel's statements were a tactical retreat designed to retain credibility and win the jury's trust. (*Id.* at 27 (citation omitted).)

The right to decide to assert innocence or plead guilty rests solely with the defendant. *See McCoy v. Louisiana*, 138 S. Ct. 1500, 1509 (2018). "When a client expressly asserts that

the objective of '*his* defense' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." *Id.* (citations omitted). However, absent an express statement by the defendant, "an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest." *Id.*; *see also United States v. Felicianosoto*, 934 F.3d 783, 786–87 (8th Cir. 2019) (noting that *McCoy* did not eliminate ability of lawyer to concede guilt where client neither consents to or objects to the strategy). To that end, the Eighth Circuit has held that if trial counsel concedes guilt in the form of a "reasonable tactical retreat" designed to "retain some credibility and gain an advantage by winning the jury's trust," as opposed to "complete[ly] surrender[ing]" to the government, it is not deficient performance under the first prong of *Strickland*'s ineffective-assistance-of-counsel test. *Lingar v. Bowersox*, 176 F.3d 453, 459 (8th Cir. 1999), *cert. denied*, 529 U.S. 1039 (2000).

The record clearly establishes that trial counsel did not explicitly or implicitly concede guilt in his opening statement, and accordingly his performance was not deficient on that ground. The two statements Xiong points to, when taken in context, do not amount to a concession of guilt. Trial counsel's statement that he had the "difficult duty of defending . . . Xiong," is not a concession of guilt. At best, it suggests to the jury that Xiong's defense will be complex but effective, and at worst it suggests that the government has presented evidence that will be difficult to refute. But admitting that evidence against your client exists is not a "complete surrender" of guilt, but rather a tactical retreat, and even then, only in a limited sense. *Lingar*, 176 F.3d at 459. When viewed in light of the "strong

presumption" of sufficient attorney performance, *see Guzman-Ortiz*, 849 F.3d at 713 (citations omitted), such language is not ineffective assistance of counsel.

The same is true for counsel's statement that Xiong "did a lot of the things that you heard." (TT Vol. 6 at 957.) The full statement is as follows:

> But you have not heard Mr. Xiong with his testimony of the reasons why and the reasons behind his actions (sic). *We, the Defense, will put testimony in front of you in the hopes that you'll find that Mr. Xiong did a lot of the things that you heard.* But the one thing I want you to keep in mind is that his—the Government accuse or alleges (sic) Mr. Xiong of intentionally lying for people to give him money or property. . . . However, I will present to you and Mr. Xiong himself will prevent to you what his intentions are, what his good faith intentions are in this—in his journey or in his pursuit of a Hmong Country or Hmong Tebchaws for his members and his people.

(*Id.* at 957–58 (emphasis added).) Viewed in context, trial counsel was not admitting guilt, but rather informing the jury that the *defense* was going to show that even though Xiong engaged in some of the actions at issue, he lacked the requisite intent to commit fraud. (*See* Final Jury Instructions [Doc. No. 98] at 6 (requiring "intent to defraud" as an element of wire fraud), 8 (same as to mail fraud).) Instead of admitting guilt, trial counsel was informing the jury of the defense's plan to contest at least one element of the charges against Xiong. Even taken in the worst light possible, it was a "tactical" admission as to some of the underlying facts of Xiong's actions, not an implied or express admission of guilt. Accordingly, Xiong also fails to establish deficient performance based on this statement by his trial counsel.

### b.    Testimony regarding Steve Moua

Xiong next asserts that he received ineffective assistance of counsel when trial counsel conceded guilt during his cross examination of government witness Steve Moua. (Def.'s Mem. at 6.) Specifically, Xiong argues that trial counsel compared Moua's prior conviction

for conspiracy to commit wire fraud—which happened to involve a different person also named Seng Xiong—with Xiong's case, which "implied a connection with Xiong and implied [] Xiong's guilt in the present case" and was accordingly a "complete surrender of guilt[.]" (*Id.* at 6–7.)  Xiong also argues that during the defense case-in-chief, trial counsel used a defense witness, Dao Moua, to attempt to implicate Steve Moua as the leader of the conspiracy to commit fraud.  (*Id.* at 7–8.)  Such a strategy was unreasonable, Xiong argues, because it did not negate Xiong's culpability, and in fact "enhances Xiong's likelihood of guilt in the eyes of the jury because Steve Moua had been previously convicted of the same crime[.]"  (*Id.* at 8.)  Xiong relies primarily on *Lindstadt*, 239 F.3d at 202, for the proposition that defense counsel's statements may be considered in the aggregate when evaluating ineffective assistance claims, as well as *Fisher v. Gibson*, a Tenth Circuit case that held that repeatedly lending support to the government's version of events is "virtually tantamount to a concession of guilt."  282 F.3d 1283, 1304 (10th Cir. 2002).

In response, the government argues that targeting Steve Moua was a "prudent strategy" for trial counsel because it suggested that Moua, and not Xiong, was "the person making false promises, exaggerating Xiong's accomplishments, pressuring supporters . . . and using Xiong's statements out of context."  (Gov't Mem. at 27–28.)  Such a strategy was reasonable, the government asserts, because it did not necessarily implicate Xiong.  (*Id.* at 28.)

"[S]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable [in an ineffective assistance claim]; and strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."

*Strickland*, 466 U.S. at 690–91. Accordingly, the Eighth Circuit has held that courts should "'generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel.'" *United States v. Orr*, 636 F.3d 944, 952 (8th Cir. 2011) (quoting *Villalpando*, 259 F.3d at 939), *cert. denied*, 565 U.S. 1063 (2011). Still, the court has also acknowledged that "'[a]bsent competent counsel, ready and able to subject the prosecution's case to the crucible of meaningful adversarial testing, there can be no guarantee that the adversarial system will function properly to produce just and reliable results.'" *Id.* (quoting *Driscoll v. Delo*, 71 F.3d 701, 706 (8th Cir. 1996) (internal quotation marks omitted)). As such, the Eighth Circuit has found deficient performance based on ineffective cross examination where counsel "allowed inadmissible devastating evidence before the jury" and where "counsel failed to cross-examine a witness who made grossly inconsistent prior statements." *Id.* (citations omitted) (internal quotation marks omitted).

This is not one of those cases. Trial counsel's cross-examination of Steve Moua and direct examination of Dao Moua about Steve Moua were not tantamount to a concession of guilt, nor were they constitutionally infirm. When cross examining Steve Moua, trial counsel started by impeaching him with his prior conviction for conspiracy to commit wire fraud. (TT Vol. 4 [Doc. No. 158] at 487–88.) While doing so, trial counsel also had Steve Moua admit that while the person with whom he had previously conspired was named Seng Xiong, his prior associate was a "different Seng Xiong[]." (*Id.* at 488.) Impeaching a witness through a prior conviction is a proper subject for cross-examination, *see* Fed. R. Evid. 609(a), and the clarification for the jury that Xiong was not the same person with whom Steve Moua had previously conspired was, contrary to Xiong's assertion, necessary to insure that the jury did

not confuse Xiong with someone who had already been involved in a conspiracy. Rather than permitting "inadmissible devastating evidence before the jury" or failing to "cross-examine a witness who made grossly inconsistent prior statements," *see Orr*, 636 F.3d at 952, trial counsel attacked Steve Moua's credibility by showing that he had been convicted in the past of a conspiracy to commit fraud, and clarified that it was not with his client, both of which fall well within trial counsel's professional discretion on cross-examination.

Xiong's claims about trial counsel's examination of Dao Moua fare no better. On direct examination, Dao Moua testified about how he learned about the Hmong Tebchaws, and how he came to contribute funds. (TT Vol. 7 [Doc. No. 161] at 1062–75.) Trial counsel elicited several favorable statements during this testimony, including that Steve Moua was in the YouTube videos discussing the Hmong Tebchaws, and that Steve Moua controlled the conference phone line used by the organization to discuss contributions and other information. (*Id.* at 1062–64.) Dao Moua also stated that every time he called into the conference line, he recalls hearing Steve Moua discussing the membership tiers of the organization, and he believed that he had to talk to Steve Moua to join the Hmong Tebchaws. (*Id.* at 1065–68.) Moreover, he explicitly stated that Steve Moua was "the one that lead me (sic) into the Hmong Tebchaws," (*id.* at 1068), and when asked about who was leading the organization, he testified that there were elders—and notably, did not identify Xiong—who would make decisions and resolve conflicts within the organization. (*Id.* at 1068–69.) When asked how he came to provide financial support for the organization, Dao Moua testified that he "talk[ed] to Steve Moua about it" and that Steve Moua was the one who encouraged him to give money. (*Id.* at 1072.) Steve Moua told him about the benefits of giving money and provided Xiong's

bank account information so he could give the money.  (*Id.* at 1072–1080.)  Overall, contrary to Xiong's assertion, trial counsel's examination of Dao Moua painted Steve Moua as the mastermind of the fraud, which in turn cast doubt on the level and extent of Xiong's involvement.  Indeed, in his affidavit to the Court, trial counsel explained that shifting the blame to Steve Moua was one of the defenses he attempted to pursue at trial.  (*See* Trial Counsel Affidavit [Doc. No. 188] at 3–4, ¶ 11–12.)[3]

Considered as a whole, the record shows that trial counsel's cross examination of Steve Moua, and direct examination of Dao Moua, did not constitute explicit or implicit admissions of guilt, and did not fall below an objective reasonableness standard.  Moreover, neither examination introduced "inadmissible devastating evidence" or constituted a failure to cross-examine a witness about "grossly inconsistent prior statements."  *Orr*, 636 F.3d at 952.  And while statements made by Steve Moua and Dao Moua confirmed some of the facts offered by the government, confirmation of underlying facts is hardly repeated support "tantamount to a concession of guilt," *see Fisher*, 282 F.3d at 1304.  To the contrary, Dao Moua's testimony tended to establish that Steve Moua, and *not* Xiong, was the one engaged in fraud.  Accordingly, Xiong's contention that these two issues constitute ineffective assistance fails.

### c.    Fifth Amendment Right During Testimony

Xiong argues that trial counsel failed to provide effective assistance when he advised Xiong of his Fifth Amendment rights while Xiong was on the stand in front of the jury, which

---

[3]    He also noted, however, that Xiong later rejected such a blame-shifting defense because it would require him to "relinquish his position" as "leader" in front of his followers, a position he apparently found untenable.  (*See* Trial Counsel Aff. at 3–4, ¶ 11–12.)

"essentially [told] the jury Xiong was guilty by providing the benefit of an inference of guilt to the government's case." (Def.'s Mem. at 9.) In the middle of the government's cross examination of Xiong, trial counsel stated: "Mr. Xiong, I advise you of your Fifth Amendment right." (*Id.* (quoting TT Vol. 7 at 1257).) Xiong continued speaking, at which point the Court interrupted him and said "Mr. Xiong, please, for your own sake, do not testify." (*Id.*) According to Xiong, such an "outrageous invocation" was prejudicial, and counsel further failed to request and obtain a remedial instruction. (*Id.* at 9.)

The government responds that counsel's statement during Xiong's testimony did not prejudice him because it occurred when Xiong started to testify about employing a "military" strategy in Southeast Asia. (Gov't Mem. at 28–29.) Such testimony was unrelated to whether Xiong had committed wire or mail fraud, the government posits, and was therefore collateral to the issues at hand. (*Id.* at 29.) Furthermore, the government asserts that even if referencing Xiong's Fifth Amendment rights was deficient performance, Xiong was not prejudiced by it because trial counsel was trying to protect Xiong from other serious criminal charges, and in fact succeeded in doing so. (*Id.*)

The precise issue before the Court is not whether Xiong's Fifth Amendment rights were violated, but rather whether his trial counsel's interruption to advise him of his Fifth Amendment rights in front of the jury constituted ineffective assistance of counsel. It is true that "a claim of Fifth Amendment protection is likely to be regarded by the jury as high courtroom drama and a focus of ineradicable interest, when in fact its probative force is weak and it cannot be tested by cross-examination." *United States v. Lacouture*, 495 F.2d 1237, 1240 (5th Cir. 1974), *cert. denied*, 419 U.S. 1053 (1974). However, trial counsel

understandably felt obligated to ensure that Xiong did not inadvertently expose himself to other serious criminal charges. In fact, during a break just before the government rested its case, the Court examined Xiong to insure that he understood that he had the right to remain silent and to advise him of the risks he faced in the choice to testify. (TT Vol. 6 at 949.) Xiong indicated he had not yet discussed that decision with his counsel. (*Id.* at 950–51.) The government then made the following statement:

> [W]e wanted to make sure that he understands that if he testifies in such a way that he suggests that he supported any kind of armed conflict or insurgency outside of the United States or that that was his intent or that he came to an agreement with others to support an armed insurgency, that he would be making that testimony under oath. He has not been charged with that conduct in this case. In this case he's been charged with mail fraud and wire fraud. And that the United States Government is reserving its right to prosecute him if he admits to other crimes that are chargeable under federal law.
>
> Those crimes could include . . . conspiracy to commit murder overseas[,] . . . crimes under the Neutrality Act[, or] . . . [other federal] statutes . . . that criminalize conduct associated with supporting insurgencies or the overthrow of foreign governments. . . . [I]f he does waive his Fifth Amendment right and admits to a crime, the Government may prosecute him for any of those such crimes in a subsequent case.

(*Id.*) The Court then gave Xiong time to discuss with counsel whether to testify. (*Id.* at 951.)

Upon his return, the Court again inquired about whether Xiong would testify. (*Id.*) Xiong indicated that he understood his rights and that he would testify. (*Id.* at 952.) Later, when Xiong took the stand, the government inquired about what he planned to do if he had been permitted to board the plane to Thailand. (TT Vol. 7 at 1256.) Xiong noted that there was a "military structure" to his plan. (*Id.*) The following exchange occurred:

GOV'T:     So, what is this military structure that you're referring to[?]

DEF:       The military structure consists of two parts: The first part is the component of the insurgency. Let's put it that way.

| GOV'T: | So where is there going to be an insurgency? |
|---|---|
| DEF. COUNSEL: | Mr. Xiong, I advise you of your Fifth Amendment right. |
| DEF: | Okay. It's part of the guerrilla — |
| GOV'T: | Your honor, may we approach? |
| COURT: | Yes. |
| DEF: | It's part of the guerrilla — |
| COURT: | Mr. Xiong, please, for your own sake, do not testify. |

(TT Vol. 7 at 1256–57.)  The Court then had a discussion with the attorneys at the bench, in which the government asserted that Xiong could no longer assert his Fifth Amendment right because he was already testifying.  (*Id.* at 1257.)  However, the government did not re-ask the question, and moved on to different subjects.  (*Id.* at 1258.)

Xiong waived his Fifth Amendment right by taking the stand in his own defense.  By doing so, he subjected himself to cross-examination on "all relevant inquiries about the charge against him."  *Musk*, 719 F.3d at 965 (citation omitted) (internal quotation marks omitted).  While being examined about his intentions at the time he was arrested, Xiong began to testify about military processes he was pursuing in a foreign country.  (*See* TT Vol. 7 at 1256–57.)  Trial counsel's affidavit notes that this was contrary to his advice, (*see* Trial Counsel Aff. at 5, ¶ 17), and exactly the kind of testimony the government had explicitly warned Xiong about earlier.  (*See* TT Vol. 6 at 950–51.)  Any prejudice to Xiong was not a result of his trial counsel's interruption, but rather his own decision to testify.  *Id.*

To the extent Xiong suffered any prejudice from trial counsel's interruption, the record demonstrates that such prejudice did not amount to " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Guzman-Ortiz*, 849 F.3d at 713 (quoting *Hill*, 474 U.S. at 57). Trial counsel objected to stop Xiong from implicating himself in *collateral* matters that he had not been charged with, which undermines Xiong's claim that the jury presumed his guilt for the crimes he had been charged with. Trial counsel's interruption likely *reduced* any prejudice to Xiong because it successfully stopped him from potentially implicating himself in another crime. 2014 WL 1243967, at *12.

Ultimately, trial counsel's mid-cross-examination interruption was not ineffective assistance because even assuming—without deciding—that such conduct was deficient, there is no reasonable probability that the result of Xiong's trial would have been different. Accordingly, Xiong fails to establish ineffective assistance of counsel on this basis.

### d.    Closing Arguments

Xiong next argues that he received ineffective assistance when trial counsel purportedly conceded guilt in closing arguments. (Def.'s Mem. at 10.) Specifically, he contends that trial counsel argued that a scheme to defraud was created by Xiong with five other people, which in no way negated Xiong's guilt. (*Id.*) He further argues that trial counsel's argument regarding Steve Moua—and his conviction for similar fraud charges— was prejudicial to him, and that trial counsel's statements that Xiong was the "leader" of the scheme, along with five others, essentially surrendered to the government. (*Id.*) Xiong also argues that trial counsel should never have stated that Xiong was spending too much of the

money that was given to him, or rehashed the fact that Xiong testified as to "some of the wordings (sic)" on the YouTube videos promoting Hmong Tebchaws. (*Id.* at 10–11.) Still, Xiong asserts that the "*coup de gras*" came when trial counsel told the jury that they did not have to find Xiong to be innocent of the charges of mail fraud and wire fraud. (*Id.* at 11.) By making such statements, Xiong argues, trial counsel strongly suggested to the jury that he was surrendering, or at the very least was unintentionally conceding guilt, neither of which was objectively reasonable. (*Id.* at 11.) In response, the government argues that counsel's comments were a reasonable defense strategy that did not necessarily implicate Xiong. (Gov't Mem. at 27–28.)

The Eighth Circuit has held that in the context of an ineffective assistance counsel claim, closing arguments "need not be successful to be reasonable." *Sloan v. Delo*, 54 F.3d 1371, 1384 (8th Cir. 1995), *cert. denied*, 516 U.S. 1056 (1996). Consequently, even where counsel's "closing argument may not have been the most succinct or tightly structured," so long as counsel's argument "raised a number of points in [Xiong's] defense," it cannot be said that such an argument "deprived [Xiong] of a fair trial." *Parker v. Bowersox*, 188 F.3d 923, 928 (8th Cir. 1999), *cert. denied*, 529 U.S. 1038 (2000). Indeed, the Eighth Circuit has noted that review of a defense counsel's closing argument is " 'highly deferential' " precisely because " 'deference to counsel's tactical decision in his closing presentation is *particularly important* because of the broad range of legitimate defense strategy at that stage.' " *Guzman-Ortiz*, 849 F.3d at 714 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

Taken in context, trial counsel's closing arguments were not constitutionally deficient, and accordingly, not prejudicial to Xiong. Trial counsel noted the government's "high burden

of proving [Xiong's guilt] beyond a reasonable doubt," and argued that the government had failed to meet its burden in two ways: (1) it failed to prove that Xiong devised the scheme to defraud; and (2) it failed to prove intent to defraud. (TT Vol. 8 at 1321–22, 1324.) Regarding the first point, trial counsel argued that the government had failed to introduce evidence about precisely who created the Hmong Tebchaws organization; it could have been up to six people, and the government failed to show that Xiong drafted any bylaws, created any of the organization's "structures," or that Xiong was the "founder or the creator" of the group. (*Id.* at 1322.) To the extent the government had established Xiong was the leader, trial counsel argued that it had failed to show how advocating for his people, and being considered a leader by his people, necessarily meant that he had organized the fraud. (*Id.*) Moreover, trial counsel asserted that the government had failed to establish that the various levels or tiers of monetary support used by the Hmong Tebchaws had been Xiong's idea. (*Id.* at 1323.)

On the second point, trial counsel argued that the government had failed to prove Xiong's intent because it did not produce any evidence showing Xiong intentionally deceived people, or that he was "creating this lie or . . . deception to get money." (*Id.* at 1324.) Trial counsel highlighted the fact that the elders of the Hmong Tebchaws felt that Xiong's spending habits were acceptable, and asked the jury to consider how Xiong could have an intent to defraud while simultaneously keeping extremely accurate notes of who had "donated," what amount they had given, and the accompanying benefit they would be entitled to in the new country. (*Id.* at 1325.) To that end, counsel asserted that "[a] person intending to steal or to lie or to cheat people of money would not keep . . . records [or] create a ledger of every contributor" much less "generate[] a ledger, signed to confirm that, yes I did receive money,

and here is your application with my signature confirmation." (*Id.*) He offered Xiong's explanation for why the money was going to his account: "people were excited about the mission and they started donating money and they didn't have any[]place to put the money so they all agreed [to] put [it] in [Xiong's] name . . . for now." (*Id.* at 1326.) And, as additional evidence of a lack of intent to defraud, counsel pointed out that Xiong had only used a comparably small portion of all the money had received. (*Id.* at 1326–27.)

Beyond challenging the elements, trial counsel also attempted to shift the blame to Steve Moua in his closing argument. (*Id.* at 1327–28.) He encouraged the jury to question Moua's intentions, noted that Moua could have had access to Xiong's bank account, and highlighted the fact that Moua was the person who marketed the Hmong Tebchaw's mission, the membership tiers, and had been previously convicted of similar fraud charges. (*Id.*) Trial counsel was careful to clarify to the jury that Moua's prior co-conspirator shared Seng Xiong's name, but was in fact *not* the defendant. (*Id.* at 1328.)

Trial counsel closed by asking the jury to consider whether Xiong was even capable of committing the fraud at issue. (*Id.* at 1330.) He noted Xiong's passion for his people and his efforts to achieve independence for the Hmong. (*Id.* at 1330–31.) And while he admitted that Xiong's spending habits were perhaps "unbelievable," and that there was no evidence that he was contacted by or worked with any governing official, he argued that Xiong's arrest just before leaving for Thailand was evidence that he was trying to start the process of building the Hmong country. (*Id.* at 1331–32.) He also disputed whether Xiong's voice was on the YouTube videos by suggesting that Moua modified the videos' audio. (*Id.* at 1332–33.)

Xiong is correct that trial counsel asserted that the jury did not have to find Xiong innocent. (*Id.* at 1327.) However, far from a *coup de gras*, Xiong cherry-picks half a sentence in an attempt to show a concession of guilt. The full point made by trial counsel states:

> Now, you don't have to find Seng Xiong to be innocent of the charges of mail fraud and wire fraud. You just have to be doubtful. You just have to think and say, geez, is he really intending to steal all these's people's money? (sic) Is — are his actions actually the actions to commit fraud? Throughout the trial, we have seen a lot of doubts or a lot of alternatives in this case.

(*Id.*) In context, trial counsel's statement did not concede guilt. Rather, it was a correct statement of the legal standard regarding guilt in a criminal case. One need not be found innocent in order to be found not guilty, if the government fails to meet its burden of proof to establish that the defendant committed all the elements of the applicable crime beyond a reasonable doubt. *See United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984) ("[A]n acquittal on criminal charges does not prove that the defendant is innocent; it merely proves he existence of a reasonable doubt as to his guilt."). In fact, by highlighting this aspect of the criminal justice system, trial counsel informed the jury about the unique difference between innocence and legal guilt. *See United States v. Mendoza-Acevedo*, 950 F.2d 1, 4 (9th Cir. 1991) ("[W]ithin our criminal justice system, we think the difference between 'not guilty' and 'innocent' is more than semantics." (citation omitted)); *Reynolds v. United States*, 238 U.S. 460, 463 (9th Cir. 1956) ("[W]here the prosecution is unable to muster evidence sufficient to overcome the presumption [of innocence], there will be an acquittal, even though the defendant may be actually guilty.").

Ultimately, trial counsel's argument had a structure, properly highlighted the burden of proof, and contested whether the government had met its burden. Counsel attacked the

elements of the crimes that Xiong was accused of, and attempted to shift blame to Steve Moua. He contested his client's intent, noted facts that could be construed to suggest a lack of an intent to defraud, and closed by asking the jury to find Xiong "not guilty" of the charges against him. (*Id.* at 1333.) Any admissions—such as the "unbelievable" nature of Xiong's spending habits, or his lack of any government contacts—were "tactical retreats" in the face of the government's overwhelming evidence. *See Lingar*, 176 F.3d at 459. In sum, while trial counsel's argument was not perfect, it did have a structure and "raised a number of points in [Xiong's] defense." *Parker*, 188 F.3d at 928. Under the " 'highly deferential' " review of trial counsel's closing statement, *see Guzman-Ortiz*, 849 F.3d at 714 (citation omitted), Xiong's counsels' closing arguments were not constitutionally deficient, even though they ultimately failed. *See Sloan*, 54 F.3d at 1384.

### 2. Failure to Raise Entrapment by Estoppel Defense and Deficient Pretrial Performance

Xiong next argues that he received ineffective assistance because trial counsel failed to raise an entrapment by estoppel defense and engaged in deficient pretrial performance. (Def.'s Mem. at 12.) This failure, Xiong contends, stemmed from trial counsel's lack of adequate investigation of the facts underlying Xiong's case. (*Id.*) He further contends that "entrapment by estoppel" would have been an "obvious choice" for an attorney who had conducted an adequate investigation, and trial counsel's deficient performance prevented Xiong from pursuing the defense despite his best efforts. (*Id.* at 13 (citing TT Vol. 1 at 8– 12.) Additionally, Xiong argues that trial counsel failed to even understand what an "entrapment by estoppel" defense required. (*Id.*) As a result, Xiong contends that trial

counsel prevented him from presenting a meaningful defense and accordingly he was prejudiced. (*Id.* at 14.) Beyond that overarching argument, Xiong also argues that trial counsel was defective because he failed to submit a Rule 12.3 notice, demonstrate apparent authority, and object to the preclusion of perceived public authority defenses, and because he failed to submit any other appropriate pretrial motions. (*See* Def. Mem. at 12–26.) Each asserted violation is addressed in turn.

### a. Entrapment by Estoppel Defense

Xiong argues that he received ineffective assistance when trial counsel failed to present an entrapment by estoppel defense, largely due to his failure to adequately investigate the facts underlying Xiong's case. (*Id.* at 12.) In response, the government argues that counsel's performance was not deficient because there was simply no factual basis for an entrapment by estoppel defense. (Gov't Mem. at 30.) The government points to Xiong's admission prior to trial that no one ever told him he could have a Hmong country, or that anyone authorized him to have a country, and the fact that at best, Xiong had conversations with a few government officials 8 to 12 years prior to Xiong's scheme who did not authorize or direct him to do anything. (*Id.* at 34.) The government also points to Xiong's statements that he had no evidence that he was working with, or operating under the actual or apparent authority of, high-ranking government officials between 2014 and 2016 (when his scheme was in operation). (*Id.*) As such, the government asserts, counsel's failure to raise an entrapment by estoppel defense was not deficient performance. (*Id.* at 34–35.)

The affirmative "public authority" defenses and the defense of "entrapment by estoppel" are related, but distinct. *See United States v. Achter*, 52 F.3d 753, 755 (8th Cir.

1995). "Public authority" defenses are affirmative defenses where "the defendant seeks exoneration based on the fact that he reasonably relied on the authority of a government official to engage him in covert activity." *Id.* (citing *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994)). Generally, public authority defenses depend "upon whether the government agent in fact had the authority to empower the defendant to perform the acts in question." *Id.* (citations omitted). The defense of "entrapment by estoppel," on the other hand, " 'has been held to apply when an official assures a defendant that certain conduct is legal, and the defendant reasonably relies on that advice and continues or initiates the conduct.' " *Id.* (quoting *United States v. Smith*, 940 F.2d 710, 714 (1st Cir. 1991) (footnote omitted)). Put another way, "entrapment by estoppel" involves the "concept of unintentional entrapment by an official who mistakenly misleads a person into a violation of the law." *Id.* (citation omitted) (internal quotation marks omitted). Both defenses "require a defendant to establish that he reasonably relied on the representations of a government official" as to the specific criminal conduct he has been charged with. *Id.* Moreover, because the defenses are affirmative defenses, district courts may preclude the defenses from being asserted at trial if the defendant fails to proffer a *prima facie* case of the defenses' elements. *Id.*; (Order on Public Authority Defense at 6, n.1 (noting that a "defendant must produce sufficient evidence to allow the jury to infer the fact at issue and rule in the defendant's favor as to *each element* of the [affirmative] defense" (citation omitted).)

The failure to raise a defense can constitute ineffective assistance of counsel. *See United States v. Coutentos*, 651 F.3d 809, 818 (8th Cir. 2011) (finding trial counsel's failure to raise statute-of-limitations defense to be both deficient performance and prejudicial to

defendant).  However, "the law does not require counsel to raise every available nonfrivolous defense" in order to avoid a finding of deficiency.  *See Knowles v. Mirzavance*, 556 U.S. 111, 127 (2009) (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).  Indeed, an attorney's strategic choice of which defenses to assert, if "made after a thorough investigation of law and facts relevant to plausible options," is "virtually unchallengeable."  *Id.* at 124 (citation omitted) (internal quotation marks omitted); *see also Murden v. Artuz*, 497 F.3d 178, 198–99 (2d Cir. 2007) (concluding that failure to bring a defense was not ineffective assistance of counsel where evidence was inconsistent with, and insufficient to establish, the elements of the defense), *cert. denied*, 552 U.S. 1150 (2008).  Importantly, courts "must not evaluate counsel's performance with the acuity made possible by hindsight [but] rather . . . from counsel's perspective at the time of the trial."  *Simmons v. Iowa*, 28 F.3d 1478, 1481 (8th Cir. 1994), *cert. denied*, 513 U.S. 1178 (1995).  Consequently, where an attorney does a "thorough job of investigating" a defense's propriety, and makes a "carefully reasoned and supportable decision" to not assert the defense, courts do not "second-guess" that decision.  *Id.*  And in any event, even assuming counsel failed to provide effective assistance by declining to assert a particular defense, a defendant must still show prejudice in that, but for the attorney's decision, there was a "reasonable probability" that the outcome of the defendant's case would have been different.  *Nazarenus v. United States*, 69 F.3d 1391, 1395 (8th Cir. 1995).

Here, Xiong fails to establish that trial counsel's performance was deficient under *Strickland* because the record conclusively demonstrates that trial counsel's refusal to bring an entrapment by estoppel claim was based on a thorough investigation of the facts underlying Xiong's case, and his conclusion that the defense lacked any basis in fact.  *See Murden*, 497

F.3d at 198–99; *see also Xiong*, 914 F.3d at 1158 (noting that Xiong provided no evidence, other than his own testimony, that he had spoken with government officials). Trial counsel explains in his affidavit that he discussed many possible defenses with Xiong, including perceived public authority, entrapment by estoppel, misidentification, and even mental insanity. (Trial Counsel Aff. at 2, ¶ 3.) He noted that Xiong had provided him with the names of several government officials that he claimed he had been working with to establish a Hmong country. (*Id.* at 2, ¶ 4.) However, after investigating these contacts, trial counsel learned that Xiong's contact with those individuals had been back in 2006, years before his scheme began. (*Id.* at 2, ¶ 5.) Moreover, he could find no evidence of any communications between Xiong and those individuals related to Xiong's fundraising activities or quest to create a Hmong country. (*Id.*) In fact, at least one official with whom counsel contacted denied even knowing who Xiong was, despite Xiong's assertion that he was one of his "main contacts and advisors." (*Id.* at 3, ¶ 6.) Trial counsel further explained that he reached out to the State Department, the White House, and the United Nations to determine whether there was any record of Xiong and his initiative to create a new Hmong country; aside from an informational visit to the U.N., all three entities had no record of any such initiative by Xiong. (*Id.* at 3, ¶ 8.) Given this glaring lack of evidence, trial counsel explained that he chose not to assert a public authority or entrapment by estoppel defense. (*Id.* at 3, ¶ 10.)

Trial counsel's explanations are borne out by the contemporaneous record of the pretrial and trial proceedings. Prior to trial, even when questioned directly by the Court, Xiong admitted that no government official had ever endorsed or authorized a new Hmong country, or ever represented that he could have a Hmong country, and that at best, they just

advised him about the requirements for creating a new country. (*See* TT Vol. 1 at 11–12.) Xiong provided no explanation of witnesses who would testify that he was authorized to collect funds because a new country was nearing approval or had been approved; he also does not provide information about any such witnesses now. At trial, even while testifying, he offered no evidence that government officials had ever given him the impression that a new country had been approved, or that the government was even endorsing such a proposal. Put simply, Xiong's admissions, combined with trial counsel's explanation of his efforts to investigate the basis for an entrapment by estoppel defense, demonstrate that there was no basis in fact for arguing that Xiong reasonably relied upon statements by a government official that he could collect funds from supporters while telling them that a new country was almost, or actually had been, approved. Taken in light of the " 'strong presumption' " that counsel's conduct constituted " 'reasonable professional assistance,' " *Guzman-Ortiz*, 849 F.3d at 713 (quoting *Strickland*, 466 U.S. at 689), and in consideration of trial counsel's thorough investigation into Xiong's case, the Court will not "second-guess" counsel's judgment. *Simmons*, 28 F.3d at 1481. The Court concludes that "[c]ounsel's strategy choice was [] within the range of professionally reasonable judgments." *Strickland*, 466 U.S. at 699.

### b. Rule 12.3 Notice, Apparent Authority, and Failure to Object to Preclusion of Public Authority Defenses

Xiong next argues that trial counsel's failure to provide a Rule 12.3 notice pursuant to Fed. R. Crim. P. 12.3, failure to argue for the existence of "apparent authority" supporting a public authority defense, and failure to object to the preclusion of public authority defenses, all constituted ineffective assistance because it left him defenseless. (Def.'s Mem. at 15.)

Xiong argues that despite being given multiple opportunities by the Court, and trial counsel's delayed response, counsel never came forward with a disclosure of "potential witnesses that [] Xiong had contact with in relation to his efforts to establish a Hmong nation." (*Id.*) Xiong also asserts that this failure precluded him from bringing an "innocent intent" defense. (*Id.* at 16–17.) With respect to "apparent authority," Xiong specifically contends that he "reasonably relied on [government statements to General Vang Pao]"—an individual who had worked with the government during the Vietnam War and had engaged in fundraising from the Hmong people in the United States following the war—"in continuing the fundraising" for the purpose of creating a Hmong homeland. (*Id.* at 20–21.) Trial counsel's failure to proffer evidence of the "several connections" between Xiong's activities and Vang Pao's activities was prejudicial, Xiong argues, because what he was doing was "similar to what other Hmong leaders have done in the past." (*Id.* at 22; *see also id.* at 23–25 (arguing the Court erred by concluding that an "innocent intent" defense required "actual authority").) In response, the government argues that counsel was not deficient for failing to pursue a defense—whether by arguing for apparent authority, objecting to the preclusion of public authority defenses, or filing a Rule 12.3 notice—lacking any basis in fact or law. (Gov't Mem. at 35.)

Federal Rule of Criminal Procedure 12.3(a)(1) and (a)(4)(a) requires a defendant who intends to assert a "defense of actual or believed exercise of public authority" to notify an attorney for the government in writing, and disclose (upon the government's request) the name, address, and telephone number of each witness the defendant intends to rely on to establish a public authority defense. Failure to do so can result in exclusion of the testimony of any undisclosed witness regarding a public authority defense. Fed. R. Crim. P. 12.3(c).

While the text of the rule requires disclosure of witnesses related to the defense of "actual *or believed* exercise of public authority," which suggests that apparent authority could form a valid basis for the defense, the Eighth Circuit has not yet decided whether a public authority defense can be satisfied with a showing of apparent, instead of actual, authority. *See Xiong*, 914 F.3d at 1160.

As noted above, the failure to raise a defense can constitute ineffective assistance of counsel. *See Coutentos*, 651 F.3d at 818. Still, an attorney's strategic choice of which defenses to assert, if "made after a thorough investigation of law and facts relevant to plausible options," is "virtually unchallengeable." *Knowles*, 556 U.S. at 124 (citation omitted) (internal quotation marks omitted). In terms of pretrial notices, some courts have held that the failure to timely file a pretrial notice of a defense (usually an alibi) "may be considered ineffective assistance if it precluded the presentation of an alibi defense which could have changed the outcome of the case." *People v. Milazo*, 18 A.D.3d 1068, 1070 (N.Y. App. Div. 2005) (collecting cases). However, other courts have held that an attorney's failure to file timely notice of a defense (or, in some cases, disclose a witness for trial) is *not* ineffective assistance of counsel where the record establishes that even if the notice had been timely filed, the defense or witness was simply not viable, relevant, or helpful. *See, e.g.*, *State v. Barnes*, 724 N.W.2d 807, 812 (Neb. 2006) (concluding that failure to timely file notice to raise insanity defense was not ineffective assistance where record established defense was not viable); *Patterson v. State*, 670 N.W.2d 439, 442 (Minn. 2003) (concluding that exclusion of cumulative and irrelevant witness due to counsel's failure to timely disclose the witness's identity was not prejudicial under *Strickland*).

For the same reasons discussed above regarding the entrapment by estoppel issue, the Court concludes that Xiong's trial counsel's alleged failure to file a Rule 12.3 notice, argue apparent authority, or object to the preclusion of public authority defenses cannot be considered objectively unreasonable, much less prejudicial, because there was simply no factual basis to assert *any* public authority defense on Xiong's behalf. As noted above, Xiong admitted that no government official had ever endorsed, much less approved, a new Hmong country. (*See* TT Vol. 1 at 11–12.) Moreover, Xiong's current assertion that there were witnesses in his favor falls flat; he does not identify those witnesses, and trial counsel's own investigation belies his claim. (Trial Counsel Aff. at 3, ¶ 10 (noting, based on his investigation, that all of Mr. Xiong's purportedly "key" witnesses turned out to be "outdated and/or irrelevant" to his fraud case).) Xiong cannot rely on incidental contacts he had with government officials years before he instituted his scheme for either an actual or apparent authority defense because such contacts are simply insufficient as a matter of law. *See Xiong*, 914 F.3d at 1160 (noting Xiong's purported evidence of public authority authorization failed to meet even "a lesser apparent authority standard").

Xiong's argument that he "reasonably relied" on unidentified communications between the United States government and an individual known as General Vang Pao does not change this conclusion. General Vang Pao was a high-ranking Laotian military officer who worked with the United States in countering Vietnamese presence in Laos during the Vietnam War. (TT Vol. 6 at 823–27.) When the United States left Vietnam, it organized an evacuation for General Vang Pao and thousands of Hmong soldiers; many of those individuals, including General Vang Pao, resettled in the United States. (*Id.* at 827–31.)

General Vang Pao then purportedly engaged in fundraising efforts to secure a homeland for the Hmong people. (Def.'s Mem. at 1.)

Xiong contends that he is the successor to General Vang Pao's fundraising efforts to establish a new Hmong country. (*Id.*) However, Xiong's "several connections" between himself and General Vang Pao remain unexplained. (*See* Am. Robinson Aff. in Supp. of Motion to Vacate [Doc. No. 190-2] at ¶ 12 (asserting, without support, that Xiong came forward to fill the void left by General Vang Pao's death).) But even assuming Xiong was General Vang Pao's "successor," and further assuming Xiong reasonably relied on still-unidentified United States' communications to the General that he could engage in fundraising activities, Xiong fails to provide any factual basis for the proposition that a government official with actual *or* apparent authority had approved the creation of a new Hmong country, a central assertion used by Xiong to defraud his followers. (*See* TT Vol. 1 at 11–12 (Xiong admitting that no official had ever endorsed or approved a Hmong country)); *see also Xiong*, 914 F.3d at 1157–58 (noting that Xiong represented to his followers that the government had approved a Hmong nation). No such country was ever authorized, which renders Xiong's purported reliance on General Vang Pao's alleged fundraising legacy legally and factually irrelevant to a public authority defense.

Finally, Xiong's assertion that his trial counsel's failure to file a Rule 12.3 motion also precluded his "innocent intent" defense is simply wrong. As this Court noted in its pretrial order discussing the various public authority defenses, an "innocent intent" defense "is not an affirmative defense at all, but rather a negation of the *mens rea* element of the crime." (Order on Public Authority Defense at 6 (citations omitted).) Accordingly, the Court noted that if

Xiong intended to argue innocent intent, "he need not present any prima facie evidence, but his testimony must not stray beyond the bounds of that defense." (*Id.* at 7.) Indeed, Xiong's trial counsel did in fact argue innocent intent to the jury. (*See* TT Vol. 8 at 1324–27.)

### c. Failure to Raise Other Pretrial Motions

Xiong next contends that he received ineffective assistance when his trial counsel failed to submit any appropriate pretrial motions, despite asking for multiple extensions and continuances to do so. (Def.'s Mem. at 25.) Xiong argues that "[m]options to limit evidence, compel disclosure, or elicit favorable evidence . . . would have been successful if made." (*Id.* at 26.) He specifically argues that trial counsel would have been successful had he filed (1) a motion in limine to exclude Steve Moua's prior fraud case with a different individual named Seng Xiong; and (2) a motion to compel disclosure of evidence favorable to the defendant regarding a defense of perceived public authority. (*Id.*) This "failure to file *any* pretrial motions," Xiong argues, "was so far out of the norm" from what a "reasonable competent attorney would do," it was patently unreasonable. (*Id.*)

In response, the government argues that trial counsel's failure to file a motion in limine seeking to exclude Steve Moua's prior fraud conviction was intentional; counsel attempted to shift blame to Moua during the trial. (Gov't Mem. at 37.) With respect to trial counsel's alleged failure to file a motion to compel disclosure of favorable evidence regarding public authority defenses, the government asserts that counsel's failure was not prejudicial because such information did not exist, and even if it did, it was not in possession of the prosecution team. (*Id.*) Moreover, Xiong alleged that it was "common knowledge" that General Vang Pao and others had previously raised money in support of a new Hmong country, which

means he had access to the same (or perhaps more) information as any prosecution team. (*Id.* at 37–38.) Under such circumstances, the government contends that Xiong's counsel was either not deficient, or at the very least, Xiong was not prejudiced.

In reply, Xiong contends that his trial counsel's purported reason for not filing pretrial motions—that such motions "had already been filed by the previous retained attorneys," (*see* Am. Robinson Aff. in Supp. of Motion to Vacate at ¶ 2—was false. (Def.'s Reply Mem. [Doc. No. 190] at 6.) Xiong asserts that trial counsel either did not know—but should have known—that pretrial motions had not been filed, or that he did know and unreasonably failed to file them. (*Id.* at 6–7.) He also argues that had the motion to compel disclosure of favorable evidence related to his perceived public authority defenses been filed, the prosecution team would have been obligated to seek out information related to communications between government officials and General Vang Pao related to the Hmong homeland, and provide them to the defense. (*Id.* at 7.)

The failure to file a motion in limine can constitute ineffective assistance of counsel where the failure was not a strategic decision and a review of the record does not provide a basis for failing to object. *See Cortez v. Davis*, 683 Fed. App'x 292, 297 n.2 (5th Cir. 2017) (citing *White v. Thaler*, 610 F.3d 890, 907–908 (5th Cir. 2010) (finding ineffective assistance where trial counsel conceded that decision to not file motion in limine was not matter of strategy)). Still, if a motion in limine would not have been successful, or where there is no reasonable probability that but for the failure to file the motion, the outcome of the trial would have been different, counsel's failure to file the motion does not constitute ineffective assistance. *See Knox v. Johnson*, 224 F.3d 470, 480–81 (5th Cir. 2000) (concluding that

failure to file motion in limine to exclude character evidence did not prejudice defendant given lack of reasonable probability that motion would have changed outcome of trial), *cert. denied*, 532 U.S. 975 (2001); *McCarver v. Lee*, 221 F.3d 583, 594–95 (4th Cir. 2000) (concluding failure to file motion in limine to exclude expert reports from trial was permissible attorney strategy, and in any event, would have failed).

Here, Xiong cannot establish that trial counsel's failure to file a motion in limine to exclude Steve Moua's prior fraud convictions constituted deficient performance. Far from deficient, trial counsel's decision to allow the conviction into evidence was an objectively reasonable trial strategy. *See Cortez*, 683 Fed. App'x at 297 n.2 (citing *White*, 610 F.3d at 907–908). In his affidavit to the Court, trial counsel explains that after his investigation determined that a public authority defense would not work, the next option was to attempt to "shift the blame to Steve Vang Moua as the mastermind of the fraud" by demonstrating that Steve Moua had the knowledge, experience, and "charisma" to commit the crimes at issue. (Trial Counsel Aff. at 3–4, ¶ 11.) Given this approach, trial counsel's decision to permit the admission of Steve Moua's federal conviction for the very same crime Xiong had been charged with was preeminently "sound and reasonable trial strategy." *McCarver*, 221 F.3d at 595. By permitting Moua's prior conviction, trial counsel further bolstered his arguments that Steve Moua was the mastermind because Moua had prior experience committing the exact same crime. (*See* TT Vol. 8 at 1328 (arguing in closing that Moua was responsible for the crime).) Moreover, trial counsel was careful to explain to the jury that Moua's co-conspirator in his prior conviction–who just happened to also be named Seng Xiong—was

not the Defendant. (*See* TT Vol. 4 at 490–91.) Under the circumstances, trial counsel's performance did not fall below an objective standard of reasonableness.

With respect to Xiong's assertion that trial counsel was deficient by failing to file pretrial motions compelling disclosure of favorable evidence related to his perceived public authority defenses, the Court holds that Xiong has failed to establish prejudice under *Strickland*. Even assuming trial counsel's failure to file pretrial motions was deficient, Xiong cannot show a reasonable probability that had his counsel filed pretrial motions, the outcome of his case would have been different. In addition to the fact that Xiong's own admissions rendered any public authority defense facially invalid, Xiong "fail[s] to indicate any exculpatory evidence" that a pretrial motion to disclose could have produced, and in any event, the government was under an "independent" and continuing duty to identify and disclose exculpatory material. *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986), *cert. denied*, 479 U.S. 1030 (1987). Accordingly, "[n]o basis exists for inferring that, had a general [] request been made, any exculpatory evidence would have been disclosed since the identification of [exculpatory[ material is a preliminary matter for the prosecutor's judgment." *Id.* (citation omitted).

Moreover, even assuming that exculpatory material existed in the form of communications between the United States and Xiong or General Vang Pao that showed he was permitted to fundraise for the Hmong people, and further assuming those communications were not disclosed, Xiong still cannot overcome the fact that it would have had no bearing on the outcome of his case because he admitted that no government official ever authorized or endorsed a new Hmong country. (*See* TT Vol. 1 at 11–12.) Xiong was

prosecuted because he made false statements while fundraising in an effort to induce the members of the Hmong community to send him funds. Because Xiong's own admissions eliminate any reasonable probability that the outcome of his trial would have been different had trial counsel made pretrial disclosure motions, he has failed to establish the prejudice prong under *Strickland*, and accordingly has failed to demonstrate ineffective assistance of counsel. And regardless, the overwhelming evidence of Xiong's guilt weighs strongly against any finding of prejudice from a failure to request disclosure of evidence by trial counsel. *See Villalpando*, 259 F.3d at 939 ("Prejudice is not shown if the evidence is so strong that the outcome of the case could hardly have been other than a verdict of guilty.").

### 3. Failure to Advise Client on Public Authority Defenses

Xiong next argues that his trial counsel was ineffective because he failed to properly advise him of his potential public authority defenses, and more specifically, the availability of an entrapment by estoppel defense. (Def.'s Mem. at 27.) Xiong notes that despite this Court's order delineating three public authority defenses that may have been available to Xiong—public authority, entrapment by estoppel, and innocent intent—trial counsel failed to explain to Xiong of the benefits and applicability of those defenses. (*Id.* at 27–28 (citing Order on Public Authority Defense [Doc. No. 84] at 7–8).) Most importantly, Xiong contends that trial counsel did not have sufficient knowledge about the law to properly pursue an entrapment by estoppel defense, and instead pursued an innocent intent defense to Xiong's detriment. (*Id.*) Accordingly, Xiong contends, "it can be surmised that . . . counsel could not have adequately and reasonably advised his client on this issue." (*Id.*) In response, the government reasserts that any failure by trial counsel to raise a public authority defense cannot

constitute ineffective assistance because there was no factual basis for pursuing such a defense. (Gov't Mem. at 30.)

While the failure to advise a client of a potential defense can constitute ineffective assistance of counsel, the Eighth Circuit has held that the success of such a claim " 'will largely depend on whether the affirmative defense' " that trial counsel failed to advise on " 'likely would have succeeded at trial.' " *Gumangan v. United States*, 254 F.3d 701, 705 (8th Cir. 2001). As explained above, even if Xiong's trial counsel did not adequately explain the public authority defenses to Xiong, and even assuming his failure to explain is based on a lack of knowledge about the law, Xiong's own admissions demonstrate that there was no basis in fact for pursuing either an actual or apparent public authority-based defense.[4] *See supra* § II(B)(2)(a)–(b). As such, even assuming that "[trial counsel] could have explained in greater detail to [Xiong]" the various defenses that were related to his case, "[u]nder the

---

[4]      Xiong cited to *United States v. Juan*, 776 F.2d 256, 258 (11th Cir. 1985), without explanation, for the proposition that trial counsel failed to sufficiently advise him about applicable public authority defenses. (*See* Def.'s Mem. at 27.) In that case, the defendant proffered classified evidence that slightly increased the plausibility of his innocent intent defense. *Juan*, 776 F.2d at 257. The defendant admitted that "standing alone, his assertion of [innocent intent] would appear incredulous[,]" but when taken into account with the fact that "at an earlier time, he had engaged in a relationship with government agencies the nature of which were such that his belief, at the time of the charged crime, was reasonable and genuine[,]" his case was stronger. *Id.* at 258. The district court denied admission of the confidential information, finding it immaterial. *Id.* at 257. On appeal, the Eleventh Circuit reversed, noting that "under the peculiar circumstances of [the] case, proof of the prior relationship was of sufficient materiality that the district court's denial of his offer to prove it was error." *Id.* at 258.

     Here, unlike *Juan*, Xiong's own admissions demonstrate that evidence of his prior contacts with government officials provide absolutely no basis for the belief that any United States or United Nations authority had ever authorized or endorsed the creation of a new Hmong country. *See supra* § II(B)(2)(a)–(b). Accordingly, *Juan* is distinguishable.

circumstances . . . the failure to more fully discuss the case does not constitute a breach of the duty to act as a reasonably competent attorney," *Lindhorst v. United States*, 658 F.2d 598, 603 (8th Cir. 1981). In any event, trial counsel's purported failure to understand a defense that factually could not have altered the outcome of the trial does not amount to prejudice because there is no " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *See Strickland*, 466 U.S. at 687 (quoting *Hill*, 474 U.S. at 57).

### 4.    Failure to Request Jury Instructions

Xiong also argues that he received ineffective assistance when his trial counsel failed to request a jury instruction on the "innocent intent" and "entrapment by estoppel" defenses. (Def.'s Mem. at 29–30.) Furthermore, Xiong contends that his trial counsel was deficient by failing to request any "neutralizing instructions" regarding Xiong's Fifth Amendment rights, particularly after counsel's Fifth Amendment advice to Xiong in front of the jury. (*Id.* at 30.) Such an instruction, Xiong asserts, would have mitigated or dissipated any negative inferences the jury drew from counsel's Fifth Amendment interruption during Xiong's testimony. (*Id.*)

The government responds that any failure by trial counsel to request an instruction on entrapment by estoppel cannot be deficient performance because such a defense was not viable in the first place. (Gov't Mem. at 38.) With respect to an innocent intent instruction, the government argues that Xiong cannot show that any such instruction would have been helpful because the Court did instruct the jury that the government had to prove, beyond a reasonable doubt, that Xiong had an intent to defraud, and that Xiong has not shown how an

innocent intent instruction would have made any difference to the jury's consideration of Xiong's intent. (*Id.* at 38–39.) Finally, the government asserts that any failure to request a limiting or remedial instruction after trial counsel advised Xiong of his Fifth Amendment rights during trial did not prejudice Xiong because there was no reasonable probability that the outcome of the trial would have been different even with the instruction. (*Id.* at 39–40.)

The failure to request a jury instruction can, under certain circumstances, constitute ineffective assistance of counsel. *See, e.g.*, *Brown v. Brown*, 847 F.3d 502, 516–17 (7th Cir. 2017) (concluding that trial counsel's decision to not seek a limiting jury instruction regarding hearsay evidence was objectively unreasonable where instruction would have precluded consideration of evidence that substantially bolstered the government's case), *cert. denied*, 138 S. Ct. 1547 (2018); *Luchenburg v. Smith*, 79 F.3d 388, 392 (4th Cir. 1996) (affirming district court's conclusion of ineffective assistance where trial counsel failed to request predicate crime instruction which compromised the result of the defendant's trial). Still, even assuming that a jury instruction should have been requested, and that the failure to do so was deficient performance, a defendant seeking habeas relief on such grounds must still demonstrate prejudice by showing that but for counsel's failure to request the jury instruction at issue, there is a "reasonable probability" that the result of the proceeding would have been different. *Carter v. Armontrout*, 929 F.2d 1294, 1298 (8th Cir. 1991).

The Court holds that even if trial counsel was deficient by not requesting the three jury instructions Xiong contends were important, Xiong was not prejudiced and accordingly cannot show ineffective assistance of counsel. Regarding entrapment by estoppel, the Court has already explained that such a defense was not viable in light of Xiong's own admissions.

44

*See supra* § II(B)(2)(a)–(b).   Consequently, Xiong cannot demonstrate a reasonable probability that the outcome of his trial would have been different had such an instruction been given to the jury.

With respect to an innocent intent instruction, the Court reaches the same conclusion. The Eighth Circuit's opinion in *Hayes v. Lockhart* is instructive here.   *See* 852 F.2d 339, 345 (8th Cir. 1988), *vacated on other grounds*, 491 U.S. 901 (1989).   In *Lockhart*, the Eighth Circuit considered whether an attorney's failure to request a specific instruction on the defense of voluntary intoxication prejudiced the defendant for the purposes of an ineffective assistance of counsel claim.   *Id.*   After noting that defense counsel failed to offer or request a specific instruction, the court concluded that because trial counsel still presented the defense to the jury, and because "the jury instructions that were given" encompassed "specific intent, premeditation, and the State's burden of proof [and] did not in any way negate the legitimacy of counsel's argument[,]" the defendant had "failed to show that there [was] a reasonable probability that the outcome [of his trial] would have been different if a specific instruction on voluntary instruction had been given."   *Id.*

Here, much like in *Lockhart*, even assuming an innocent intent instruction would have been helpful to Xiong, the record demonstrates that the Court's instructions to the jury adequately explained, in a manner not inconsistent with an innocent intent defense, the burden that the government was required to meet with respect to the element of intent, and that defense counsel still argued innocent intent.   A defendant utilizing an innocent intent defense attacks the *mens rea* element of a crime by arguing that "he thought he was acting in

45

cooperation with the government." (Order on Public Authority Defense at 6 (citing *Baptista-Rodriguez*, 17 F.3d at 1368 n.18).) Comparatively, the Court instructed the jury as follows:

> To act with "intent to defraud" means to act knowingly and with the intent to deceive someone for the purpose of causing some financial loss or loss of property to another or bringing about some financial gain to oneself or another to the detriment of a third party. With respect to false statements, the defendant must have known the statement was untrue when made or have made the statement with reckless indifference to its truth or falsity.

(Final Jury Instructions [Doc. No. 98] at Instr. 8, p. 7.) The language "with the intent to deceive someone" and the requirement that, with respect to false statements, the defendant "must have known the statement was untrue" or made the statement "with reckless indifference to its truth or falsity," encompasses innocent intent on its face. Under the instructions given, the jury could have concluded that Xiong lacked the intent to defraud because he thought he was acting in cooperation with the government, or that he did not know or was negligently indifferent about the fact that no Hmong country had ever been endorsed or authorized.

Indeed, the Court further instructed:

> Intent or knowledge may be proved like anything else. You may consider any statements made and acts done by the defendant, and all the facts and circumstances in evidence which may aid in a determination of the defendant's knowledge or intent.
>      You may, but are not required to, infer that a person intends the nature and probable consequences of acts knowingly done or knowingly admitted.

(*Id.* at Instr. 12, p. 11.) As such, the jury was also told that it could consider Xiong's history, statements, and prior advocacy when weighing if he had the requisite intent to defraud.

Xiong's trial counsel argued these points during closing argument. He noted that the government had the "high burden" of proving it's case beyond a reasonable doubt, (*see* TT

Vol. 8 at 1321), and argued that the government had failed to prove Xiong possessed the intent to defraud because it had not produced evidence showing Xiong intentionally deceived anyone in order to obtain money. (*Id.* at 1324–25.) He asserted that Xiong's decision to keep detailed records about the individuals who gave him money demonstrated that he did not intend to defraud them, but rather to offer them something in return (i.e., benefits in the new Hmong country). (*See id.* at 1324–25.) Counsel further noted Xiong's personal use of a comparatively small portion of the funds he received, and his passion for his people and the Hmong culture. (*Id.* at 1326–27, 1330–31.) Indeed, much like in *Lockhart*, Xiong's trial counsel still argued innocent intent to the jury, and "the jury instructions that were given . . . did not in any way negate the legitimacy of counsel's argument[.]" 852 F.2d at 345. Accordingly, Xiong has failed to demonstrate a reasonable probability that the outcome of his trial would have been different with an innocent intent instruction, and therefore has not shown prejudice from his counsel's alleged failure to request the instruction. *Id.*

Finally, turning to Xiong's argument about the lack of any Fifth Amendment curative instruction, the Court concludes that Xiong cannot show prejudice. Even where "[a] limiting instruction would certainly have been appropriate," if the evidence against a defendant is "significant and substantial," he cannot establish prejudice even without a curative or remedial instruction. *Garrett v. United States*, 78 F.3d 1296, 1303 (8th Cir. 1996), 519 U.S. 956 (1996). As noted above in § II(B)(1)(c), the Court has already concluded that Xiong failed to show prejudice as a result of his trial counsel's Fifth Amendment interruption during his testimony. Accordingly, Xiong cannot show prejudice stemming from counsel's failure

to request a curative or remedial instruction for that interruption, especially when considering the "significant and substantial" evidence mustered against him.

### 5. Failures With Respect to Witnesses, Impeachment, and Purported Elicitation of Damaging Testimony

Xiong next contends that trial counsel was deficient by (a) failing to call or subpoena available witnesses; (b) failing to impeach government witnesses; (c) failing to "fully utilize" witnesses he called to testify; and (d) eliciting damaging testimony. (Def.'s Mem. at 31–33.) More specifically, he argues that trial counsel had over 310 possible witnesses he could have called in support of Xiong's defense—namely, his supporters that had donated to Xiong's efforts—yet he only called six witnesses. (*Id.* at 31–32.) With respect to impeachment of government witnesses, Xiong asserts that trial counsel improperly impeached Steve Moua with his prior criminal conviction by allowing Moua to give nonresponsive answers when asked about his criminal record. (*Id.* at 32.) Even with witnesses he did call, Xiong argues, trial counsel did not utilize their testimony to Xiong's benefit, (*see id.* at 33), and in fact elicited *damaging* testimony by attempting to implicate Steve Moua as the leader of a conspiracy but inculpating Xiong in the attempt. (*Id.*)

In response, the government argues that Xiong's new counsel for this proceeding is simply listing things he would have done differently at trial, and that the various purported deficiencies by Xiong's trial counsel fall well within the presumptively wide range of reasonable professional assistance. (Gov't Mem. at 40.) To that end, the government argues that trial counsel's investigation of Xiong's case and performance at trial was not deficient, much less prejudicial. (*Id.* at 41–42.)

After carefully reviewing the record and arguments, the Court holds that Xiong has failed to establish that his trial counsel's decisions regarding which witnesses to call, what testimony to elicit, and how to present Xiong's defense fell outside the bounds of reasonableness. As explained above, Xiong's trial counsel carefully investigated Xiong's claims that he was working with the government. *See supra* § II(B)(2)(a) (explaining counsel's efforts to investigate Xiong's case). When none of Xiong's purported government contacts proved fruitful—whether because they did not know who he was or his last contact with them was years prior to his fraudulent scheme—trial counsel transitioned his defense strategy to blaming Steve Moua for the crimes at issue. *See supra* § II(B)(2)(b), (d) (discussing trial counsel's strategy to shift blame to Steve Moua during trial and closing arguments). To the extent trial counsel did not reach out to some witnesses, any such failure can be attributed either to trial counsel's reasonable strategy to not call victims of Xiong's scheme that would actually *harm* his case by testifying that they believed his false representations (*see* Trial Counsel Aff. at 4, ¶ 13); *see also United States v. Ngombwa*, 893 F.3d 546, 552 (8th Cir. 2018) (concluding trial counsel's decision to not utilize family members for defense was "reasonable" because of potential inculpatory evidence such witnesses would have introduced), or to Xiong's own refusal to tell his trial counsel everything because some information was beyond trial counsel's "clearance." (*See id.* at 2, ¶ 3.)

Xiong's allegation that his trial counsel's impeachment of Steve Moua failed is simply incorrect. While not perfect, trial counsel did in fact succeed in affirmatively establishing that Steve Moua had previously been convicted of a conspiracy to commit wire fraud, and that

such a crime required a scheme to defraud others. (TT Vol. 4 at 487–88.) Moreover, as discussed above, trial counsel was careful to clarify that the person with whom Moua had previously conspired also happened to be named Seng Xiong, but was not in fact the Defendant. (*Id.* at 488.)

Xiong's arguments that trial counsel failed to utilize witnesses and elicited damaging testimony also fail. Xiong argues that trial counsel failed to use one of his witnesses, Dao Moua, to connect Xiong to General Vang Pao's fundraising efforts. (Def.'s Mem. at 33.) However, Xiong does not explain what knowledge Dao Moua had connecting Xiong to General Vang Pao, rendering his claim impermissibly conclusory. *See Carpenter v. United States*, 720 F.2d 546, 548 (8th Cir. 1983) ("[C]onclusory allegations are insufficient to rebut [the] presumption of [counsel's] competency."). Moreover, while Dao Moua's testimony was far from purely exculpatory, Xiong's trial counsel did elicit favorable statements from him, including that Steve Moua led him into the Hmong Tebchaws and was the organizer, campaigner and lobbyist in the group. (TT Vol. 7 at 1067–70.) Dao Moua also testified that he believed the various tiers of Hmong Tebchaw membership were created by the organization's elders, as well as Steve Moua. (*Id.* at 1071.) Overall, through trial counsel's questioning, Dao Moua painted a picture of an organization in which Steve Moua was the focal point of the group's communications, fundraising efforts, and information. (*Id.* at 1070–72.) Indeed, the last thing Dao Moua told the jury was that Steve Moua pushed him to give funds to the organization, and that Steve Moua put him in touch with Xiong to get the information necessary for submitting his "donation." (*Id.* at 1111–12.) And every witness that trial counsel called that had given Xiong money testified that they had *not* received

specific promises from Xiong about what they would receive in exchange for donating, further undermining Xiong's culpability for the crimes at issue. (*See* TT Vol. 6 at 1009–10 (Thao Xiong), 1040–41 (Nao Cha Vang); TT Vol. 7 at 1082 (Dao Moua).) Accordingly, trial counsel appears to have taken a reasonable approach to defending Xiong. *See supra* § II(B)(1)(b) (noting prudent nature of trial counsel's strategy).

Ultimately, instead of admitting "inadmissible devastating evidence before the jury" or failing to "cross-examine a witness who made grossly inconsistent prior statements," *see Orr*, 636 F.3d at 952, the record demonstrates that trial counsel mounted a strategic defense after investigating Xiong's case, impeached at least one government witness with a prior conviction, and sought to paint Steve Moua as the real perpetrator of the crimes at issue while simultaneously attempting to downplay Xiong's own involvement in the Hmong Tebchaws. Xiong's assertions fail to establish that this course of action overcomes the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Guzman-Ortiz*, 849 F.3d at 713 (citation omitted) (internal quotation marks omitted). As such, Xiong's assertions of ineffective assistance fail on these grounds.

### 6. Ineffective Assistance from Plainly Deficient Performance

Finally, Xiong argues that he received plainly defective assistance because (a) his counsel's lack of knowledge about applicable controlling authority fell below an objective standard of reasonableness; (b) counsel failed to investigate evidence which is apparent from his lack of knowledge about the case; and (c) counsel was so plainly deficient that the government's case was not subject to adversarial testing and prejudice can be presumed. (Def.'s Mem. at 34.)

Regarding lack of knowledge, Xiong asserts that trial counsel was "unaware of the elements of" wire fraud, evidenced by his statement during the trial that "wire fraud requires that you receive money through a wire transmission or something that's over some electronic manner." (*Id.* at 35 (citing TT Vol. 4 at 488).)

With respect to failure to investigate, Xiong points to several alleged deficiencies. First, he argues that trial counsel did not undertake a reasonable investigation into perceived public authority, entrapment by estoppel, any promises made to General Vang Pao, or the supposed 310 witnesses available to Xiong. (*Id.* at 36.) Second, he argues that trial counsel failed to investigate a proposal he allegedly submitted to the United Nations to support a new country for the Hmong people. (*Id.*) Third, Xiong contends that his own complaints about trial counsel just before sentencing, and the fact that the Court appointed him new counsel for sentencing, demonstrates a lack of preparedness on counsel's part. (*Id.* at 37.) Fourth, he asserts that trial counsel was unsure at various points what Xiong himself would testify about on the stand. (*Id.* (citing TT Vol. 1 at 6).) Fifth, Xiong argues that trial counsel's failure to object to an order precluding what Xiong could mention during the government' case-in-chief, and his failure to adequately pursue an innocent intent defense, evinces a lack of preparation. (*Id.* at 38.) Finally, Xiong contends that his trial counsel's failure to investigate manifested itself in the Court directly questioning Xiong about a proffer for his defenses in open court—but not before the jury—which violated his Fifth Amendment protections. (*Id.* at 39–40.)

Regarding plain deficiency, Xiong argues that trial counsel's actions cumulatively resulted in a failure to subject the government's case to meaningful adversarial testing, and

that accordingly prejudice can be presumed. (*Id.* at 40–41.) He points to counsel's purported lack of preparedness, failure to use any exhibits in his opening statements, failure to object at several points during the case, and failure to offer a short theory of the defense to counteract the summary of the indictment read against Xiong in front of the jury. (*Id.* at 41.)

In response, the government asserts that trial counsel understood what wire fraud was, and that Xiong's assertion to the contrary ignores the fact that trial counsel's statement about what wire fraud requires was made while cross-examining a witnesses and paraphrasing that witness's prior wire fraud conviction. (Gov't Mem. at 40.) Moreover, the government argues, trial counsel's investigation was not deficient because he attempted to make contact with the witnesses Xiong identified as the individuals he had spoken with about a new Hmong country, and after a thorough investigation, it became clear that there was not a witness who could testify that they had authorized a new Hmong country. (*Id.* at 41–42.)

The Court holds that Xiong has failed to establish deficient performance or prejudice on these grounds. Regarding lack of knowledge, Xiong is simply wrong about his trial counsel's purportedly incorrect statement of wire fraud during trial. The statement he refers to occurred during trial counsel's cross-examination of Steve Moua, when trial counsel asked Moua about his prior wire fraud conviction. (TT Vol. 4 at 487.) After establishing that Moua had been convicted of wire fraud, he asked him whether "a wire fraud requires that you receive money through a wire transmission or something that's over some electronic manner. Is that correct?" (*Id.* at 488.) While not the most precise or artful statement of an element of wire fraud, it is not wholly incorrect. *See* 18 U.S.C. § 1343 (2012) (noting that one aspect of the crime of wire fraud is that money or property be obtained by false pretenses transmitted

"by means of wire, radio, or television communication"). Accordingly, the Court does not find the comment to be deficient performance. Regardless, trial counsel's statement occurred while he was inquiring into a prior conviction with a witness, not attempting to argue the law to the jury, rendering any perceived prejudice from the statement illusory.

The Court reaches the same conclusion with respect to Xiong's arguments regarding his trial counsel's purported lack of investigation, many of which are merely rehashed arguments the Court has already addressed. The Court has already concluded that trial counsel adequately investigated Xiong's case, the defenses available to him, and the witnesses Xiong said would have information that could help him; any such failure to object to the preclusion of certain public authority defenses cannot be prejudicial because none of those defenses were viable in light of Xiong's own admissions.[5] *See supra* § II(B)(2)(a) (discussing investigation made by trial counsel), II(B)(3) (purported failure to advise on public authority defenses); II(B)(5) (discussing decision to not call certain witnesses). Similarly, as the Court noted above, Xiong's argument that his trial counsel failed to adequately pursue an "innocent intent" defense lacks merit given counsel's arguments to the jury at trial. *See supra* II(B)(4) (noting counsel's innocent intent argument to the jury). And the Court's direct questioning of Xiong—outside the presence of the jury and before trial even began—occurred only in the context of proffering a prima facie basis for a public authority defenses, and even then only

---

[5] With respect to Xiong's specific assertion about a proposal to the United Nations for a new Hmong country, trial counsel noted he attempted to find the document. (TT Vol. 1 at 7.) Despite reviewing "all of the evidence" and discovery in the case, he could not find such a proposal. (*Id.*) To date, Xiong has not provided a copy of this document to the Court.

because trial counsel lacked the knowledge to offer up Xiong's proffer because Xiong himself refused to tell him all the details of his purported government contacts. (*See* TT Vol. 1 at 5 (trial counsel noting that Xiong would not answer some of his questions because the information was "top secret").) As the Eighth Circuit already noted, such questioning did not violate Xiong's Fifth Amendment rights. *Xiong*, 914 F.3d at 1161. Xiong cannot show deficient performance under such circumstances, much less a reasonable probability that the outcome of his trial would have been different.

To the extent Xiong offers a few new arguments, they have no merit. Xiong's complaints about his trial counsel—which were communicated in a *pro se* letter, filed after trial but before sentencing, accusing trial counsel of ignoring a letter from the Chief of the St. Paul Police Department, (*see* Xiong Letter re: Representation [Doc. No. 121])—do not suggest deficient performance or prejudice. While the Court granted Xiong new counsel (*see* Order granting Mot. to Withdraw [Doc. No. 117]), the Court did so following trial counsel's request to withdraw, which was accompanied by Xiong's statement that he was voluntarily discharging his counsel. (*See* Trial Counsel Mot. to Withdraw [Doc. Nos. 116 & 116-1].) The Court did not make any findings that trial counsel was deficient or in any way prejudicial to Xiong. (*See* Order granting Mot. to Withdraw at 1.) It was only after the Court granted the request to withdraw that Xiong submitted a letter purporting to explain why he did not want his trial counsel's continued representation, and asked for appointed counsel. (*See* Xiong Letter re: Representation at 1–2.) Accordingly, the Court's order permitting withdrawal of Xiong's trial counsel is not evidence of defective performance.

The Court also holds that Xiong has failed to demonstrate that his counsel's performance was so facially deficient that the government's case was not subjected to adversarial testing. As discussed above, trial counsel's preparedness and trial strategy was not objectively unreasonable. Prior to trial, counsel investigated Xiong's case, and even filed a motion to dismiss on his behalf. (*See* Mot. to Dismiss [Doc. No. 51].) At trial, Xiong's counsel cross examined 19 of the government's 23 witnesses, (*see* TT Vols. 1–6, at 232, 287, 320, 339, 372, 412, 487, 543, 566, 587, 654, 663, 680, 697, 734, 769, 800, 850, 953), moved for acquittal when the government rested, (*see* TT Vol. 6 at 955), and called six witnesses for his defense. (*See* TT Vols. 6–8 at 960, 988, 1030, 1055, 1113, 1153.) Moreover, at various points, trial counsel raised objections to potentially inadmissible pieces of evidence. Based on the record, trial counsel's performance, while not perfect, was not plainly deficient. Counsel's decision to forgo submitting a short defense theory in response to a reading of Xiong's indictment, or to not use exhibits during opening arguments, are matters of reasonable trial strategy that this Court will not second guess. *Simmons*, 28 F.3d at 1481. And in any event, Xiong cannot rely on the purported cumulative effect of counsel's conduct. As the Eighth Circuit has held, "[e]rrors that are not unconstitutional individually cannot be added together to create a constitutional violation." *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) (citing *United States v. Stewart*, 20 F.3d 911, 917–18 (8th Cir. 1994)), *cert. denied*, 519 U.S. 968 (1996). To that end, "[n]either cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief." *Id.* (citing *Stewart*, 20 F.3d at 917–18). Because the Court has found none of Xiong's assertions of ineffective assistance to be valid, he cannot rely on the cumulative effect of all his assertions to carry the

56

day.  Consequently, Xiong has failed to establish that his counsel was so plainly deficient that it amounted to ineffective assistance of counsel, and or that he was prejudiced by any of the individual errors he asserted.  As such, his § 2255 motion fails.

### C.    Evidentiary Hearing and Certificate of Appealability

Based on the record before the Court, there is no basis for the Court to conduct an evidentiary hearing.  A § 2255 motion may be dismissed without a hearing if: (1) Defendant's allegations, if accepted as true, would not entitle him to relief; or (2) the allegations cannot be accepted as true because they are contradicted by the record, are inherently incredible, or are conclusions, rather than statements of fact.  *Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1998).  Moreover, where the record includes all of the information necessary for the Court to rule on the motion, an evidentiary hearing is unnecessary.  *Covey v. United States*, 377 F.3d 903, 909 (8th Cir. 2004) (citations omitted).  Applying this standard to the allegations and the record, the Court finds that the record here includes all such information.  Accordingly, no evidentiary hearing is required in this case.

In order to appeal an adverse decision on a § 2255 motion, a movant must first obtain a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1)(B) (2012).  A court cannot grant a Certificate of Appealability unless the applicant has made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This Court has considered whether the issuance of a certificate is appropriate here and finds that no issue raised is "debatable among reasonable jurists."  *Fleiger v. Delo*, 16 F.3d 878, 882–83 (8th Cir. 1994) (citing *Lozada v. Deeds*, 498 U.S. 430, 432 (1991) (per curiam)).  Accordingly, the Court declines to issue a certificate of appealability.

### III. CONCLUSION

Based on the submission and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Seng Xiong's Motion to Vacate, Set Aside, or Correct Sentence [Doc. No. 176] is **DENIED**. Additionally, Xiong's request for an evidentiary hearing is **DENIED**. Finally, as noted above, Xiong's request for a certificate of appealability is **DENIED**.

**IT IS SO ORDERED.**

Dated: February 13, 2020                    s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge